IN RE INTEREST OF D.C., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. D.C.C., APPELLANT.
426 N.W.2d 541

Filed July 29, 1988.    No. 87-877.

Margene M. Timm, of Legal Services of Southeast Nebraska, for appellant.

James Elworth, Deputy Lancaster County Attorney, for appellee.

J. David Thurber, of Doyle & Doyle Law Office, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

D.C.C., the natural mother of the minor child, D.C., involved in these proceedings, appeals from an order of the separate juvenile court of Lancaster County which terminated her parental rights pursuant to Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 1984). The court also terminated the parental rights of G.C., the child's father; however, G.C. has not appealed from that judgment, and we concern ourselves solely with the issues raised by D.C.C.

Appellant contends that the court below erred in (1) allowing the child's guardian ad litem to prosecute the termination petition filed by the State; (2) not finding that the Nebraska Department of Social Services had not made reasonable efforts to reunify the child with his mother; and (3) finding that clear and convincing evidence existed for termination of parental rights pursuant to § 43-292(2) and (6) and that it was in the best interests of D.C. to terminate the mother's parental rights.

In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, and we are thus required to reach a conclusion independent of the trial court; however, where the evidence is in conflict, we consider and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *In re Interest of M.R., J.R., and N.R.*, 228 Neb. 47, 420 N.W.2d 924 (1988); *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988).

On September 13, 1983, the State petitioned the separate juvenile court of Lancaster County, alleging that the juvenile, D.C., lacked proper care due to the faults and habits of his

mother and was, therefore, a child defined by Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1982). Specifically, the petition alleged that D.C.C. resided with a man to whom she was not married, who physically abused both her and the child. The inappropriate discipline of the child by this man caused bruises on the child. In addition, on June 13, 1983, D.C.C. had bruises on her arms and a cut lip caused by her live-in boyfriend. It was alleged that the child was at risk due to D.C.C.'s failure to protect the boy from physical abuse.

On September 22, 1983, D.C.C. entered an admission to an amended petition which contained the same essential allegations listed above. The court then found that D.C. was a child as defined by § 43-247(3)(a) by virtue of the acts and omissions of his mother. Pending final disposition, D.C.C. was permitted to keep the child in her care, provided that she give him proper care and protection and that he remain in Lancaster County.

Shortly before the first of two further dispositional hearings in November 1983, D.C.C. voluntarily placed the child in foster care while attempting to resolve her situation with the live-in boyfriend. On November 18, the court ordered that the child could be returned to D.C.C. with the supervision of the Department of Social Services and parenting classes, if the boyfriend was not to be a part of the family. If he was to be in the home, the court ordered that he undergo psychological and psychiatric evaluation prior to the child's return.

Within a few days, D.C.C. informed the court that her relationship with the boyfriend had ended, and by December 2 the child was returned to his mother. However, Child Protective Services (CPS) subsequently learned that D.C.C. and the child had in fact been in the company of the boyfriend on at least two occasions. On December 23, a supplemental petition was filed in the matter; however, following a hearing on January 5, 1984, the court found that the further specified facts did not constitute lack of proper care. The court did find that D.C.C. had lied to her CPS caseworker about contact with the boyfriend and that any further deception would result in termination of the child's placement with his mother. The November 18, 1983, order remained in effect and unchanged as

to custody and the plan for correcting the original neglect.

Following the child's return to D.C.C. in December of 1983, D.C.C. did begin participation in mental health counseling and parenting classes through the PACT program. Participation in PACT continued through late April 1984, as did D.C.C.'s mental health counseling.

On April 26, 1984, a hearing was held to determine whether D.C.C. was in violation of the November 18 order by allowing the abusive boyfriend to be present in her home. Although testimony indicated that D.C.C. and the boyfriend had been in contact on a few occasions, those contacts were due largely to his pursuit of her. D.C.C. indicated to the court and her social services workers that she would like to continue the relationship, but only if the boyfriend agreed to the psychiatric evaluation as ordered by the court and if he would submit to counseling. The court determined that D.C.C. was not in violation of the court order.

In June of 1984, at a further hearing on this matter, the court was informed that D.C.C. and the child could not be located at their Lincoln address. A neighbor informed CPS that D.C.C. had in fact moved from the address. Sharon Isaacson of CPS testified that pursuant to a CPS alert she was informed by the Council Bluffs CPS that it had received a referral on a family matching the description of D.C.C., the child, and the boyfriend. The referral alleged that a man, calling himself by the boyfriend's name, had been abusing a child in a restaurant. The boyfriend was allegedly pulling the child's hair, slapping the child and pulling his ears, and threatening the mother. Attempts by Council Bluffs CPS to contact these people were unsuccessful. The boyfriend had, on a previous occasion, told Isaacson that his home was the Council Bluffs-Omaha area. At that hearing, no other information was available on the child's whereabouts.

At that June hearing, the court ordered the Department of Social Services to take physical custody of the child as soon as he could be located, and to place the child in foster care immediately thereafter.

At a hearing on September 24, the court was informed that the child had been located on September 17 in Omaha. The

Douglas County sheriff's office picked the child up at the address supplied to CPS, and the child was returned to Lincoln and placed in foster care. Isaacson testified that when the child arrived in Lancaster County he had "a bruise in the center of his forehead and a lump [and] a small bruise on his right eyelid and he had a cut on the right half of his lower lip."

D.C.C. was not present at the September 24 hearing, but her counsel was present to represent her. Counsel informed the court that D.C.C. was making no request for return of her son; her plan was to stay in Omaha to locate suitable housing and employment, seek individual counseling, and comply with other provisions of the earlier court orders. D.C.C. requested visitation with her son and agreed to assume all the burdens of transportation to Lancaster County to exercise these visits. The court entered an order allowing supervised visitation on the above terms. In addition, the court ordered D.C.C. to present a plan showing that she could provide proper care and protection for the child. The parties agreed that the plan was to be submitted within 60 days. Apparently, no such plan was ever received by the court as ordered.

The State filed a second supplemental petition on November 8. D.C.C. admitted the allegations in the petition, as amended, on December 18. Those admissions and the testimony of other witnesses left unexplained the cuts and bruises on the child on September 17, 1984, but established that the abusive boyfriend did pull the child's hair and ears in the restaurant incident, that he had previously been abusive to the child, and that during a period from May until September of 1984 the boyfriend, mother, and child had lived in 10 different locations in 5 different states. Evidence was also introduced establishing that the child, D.C., had begun to act in a self-abusive manner due to the abusive treatment and lack of a stable environment.

The child continued his placement in a foster care home in Lincoln, and legal custody remained with the Department of Social Services. On January 8, 1985, the juvenile court approved a rehabilitative plan designed to correct the conditions of lack of proper care which led to the original juvenile court adjudication.

At the January 8 hearing, D.C.C. testified that she had

discontinued her relationship with the first abusive boyfriend. She testified that for the sake of her "self-worth" she would continue living in Omaha, but if she had not obtained employment within 1 month, she would return to Lincoln.

A 6-month review hearing was held on July 8. At that hearing, evidence was introduced indicating that D.C.C. was involved in another abusive relationship. Her second live-in boyfriend had beaten her so severely in January of 1985 that surgery was required to repair damage to her inner ear. Nevertheless, D.C.C. continued to reside with this individual.

According to evidence introduced at the July 8 hearing, D.C.C. has admitted a repeated pattern of becoming involved with abusive males. Evidence shows that prior to March of 1985, D.C.C. had been involved in five consecutive abusive relationships, beginning with D.C.'s father.

On December 2, the State filed a third supplemental petition in this matter, this time seeking termination of parental rights due to D.C.C.'s continued inability to provide proper care and a stable home for her child. This third petition sparked another 2 years of litigation in this case and generated nearly 1,500 pages of testimony and exhibits, compiled in over 7 volumes of bills of exceptions.

In October of 1986, the juvenile court terminated D.C.C.'s parental rights, but subsequently set aside its order by sustaining a motion for a new trial based on an evidentiary error during the court proceedings. D.C.C. was once again given additional time to continue rehabilitation efforts.

Ultimately, in July and August of 1987, extensive testimonial evidence was taken on this matter, the final result being termination of D.C.C.'s parental rights.

After extensive review of the record in this case, this court is convinced that D.C.C., after 4 years, made little or no progress toward correcting the conditions which led to the initial juvenile court determination that her child was a child as defined by § 43-247(3)(a).

Two major concerns have dominated the adjudication of this case from the outset. The first and more important is D.C.C.'s chronic tendency to become involved with abusive, violent males. Inevitably related to this first problem is D.C.C.'s

inability, or unwillingness, to provide a safe, secure home for her child, free from the abuse inflicted by her male companions.

Our review of the record indicates that D.C.C. continues to be involved with men who have violent tendencies. The first boyfriend referred to in this opinion abused both D.C.C. and her child on several occasions, yet she chose to leave Lancaster County with this man, taking her child with them, to embark on a five-state escapade over 5 months, only to return to Omaha with a bruised and lacerated child.

D.C.C. then chose to remain in Omaha while her child was in Lincoln in foster care. She became involved with a second man who beat her so severely about the head that she required inner-ear surgery, yet she continued to live with this man, spoke of marriage to him, and had a child by him in 1985. This boyfriend, in November of 1985, contacted an Omaha CPS worker by phone and "threatened to cause [her] physical harm . . . if [she] came near [D.C.C.] or her home."

The third and most recent boyfriend was described by D.C.C. herself as having a history of "everything except murder and rape." D.C.C. testified that his history did not concern her.

The record is clear that D.C.C. has not completely severed her ties with any of these three men. In January of 1987, D.C.C. still was expressing a desire to keep her first boyfriend, whom the child continues to express fear of, as a friend. Although D.C.C. alleges that she ended her relationship with the second boyfriend in December 1985, she still has frequent contact with the man. As late as June of 1987, she still was unable or unwilling to tell this man to stay out of her life. At the same time D.C.C. continued to see the third boyfriend up until the time of the final termination hearings. She has admitted lying to her caseworkers regarding this boyfriend's past violent history and also admitted telling him to "cool it and not come around . . . anymore" just prior to the final termination hearings.

At the time of the termination hearings D.C.C. was living in an Omaha hotel which she admits is not a suitable place for a child. She describes the area as "hooker heaven" and plagued

with violence and alcohol abuse. In addition, D.C.C. admits that she had not seriously searched for an appropriate home since December of 1986, despite housing lists' being provided by her caseworkers.

D.C.C. testified that she was not asking the court for custody, only a continuation of a plan for reunification. She presented evidence from her individual therapist, who described D.C.C. as making progress. She requested time to continue to seek appropriate housing for the purpose of beginning in-home visits from her child. In short, D.C.C. was asking the juvenile court for one more chance.

This court finds that D.C.C. was given numerous attempts at one more chance. Over a 4-year period, D.C.C. has sought individual counseling, attended parenting classes (the first of which she was terminated from due to her continued involvement with the first boyfriend; the second she dropped out of by her own choice), has unsuccessfully sought full-time employment, and has unsuccessfully attempted to maintain a stable, secure home environment. We do not agree that D.C.C. has shown sufficient progress over these 4 years to warrant another chance. Her involvement with abusive men continues, and she has been unable to secure and maintain a safe home environment for a child; nor do we see a concerted effort on her part to obtain such housing.

Nowhere in this extensive record do we see any evidence of an overwhelming desire on D.C.C.'s part to regain permanent physical custody of her child. After 4 years, during 3 of which the child has been in continuous foster care, D.C.C. is only at a point where she is requesting in-home visits sometime in the future. As we have said before, where parents are unable or unwilling to rehabilitate themselves within a reasonable time, the best interests of the child require that parental rights be terminated. *In re Interest of M.R., J.R., and N.R.*, 228 Neb. 47, 420 N.W.2d 924 (1988); *In re Interest of Z.R.*, 226 Neb. 770, 415 N.W.2d 128 (1987).

This court also finds that the State adduced clear and convincing evidence that the best interests of D.C., the child, were served by termination. The record indicates consistent behavioral problems associated with D.C.'s uncertainty as to his

placement. In 1986 and 1987 the child's counselors testified that he was experiencing bed-wetting, noncompliant behaviors, bad dreams, aggressive behavior, and anxiety due to his uncertainty about a permanent home. There was also evidence of anxiety and depression stemming from abuse and neglect.

Indefinite foster care is not an acceptable alternative where the evidence suggests the need for a fixed and permanent home. *In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987). D.C.C.'s request of the juvenile court, and of this court, is to continue the status quo, keep her child in foster care, and continue reunification efforts. The evidence in this case indicates that this course of action would be deleterious to D.C.'s well-being and would only serve to continue his anxiety and insecurity. A child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988).

Appellant also alleges that the Department of Social Services did not make reasonable efforts to reunify her with her child. Our review of the record convinces this court that the Department of Social Services and the court went to great lengths to effectuate reunification. Prior to and after D.C.C.'s move to Omaha, a myriad of services were made available to D.C.C., apparently at no expense to her. She was provided with free weekly transportation to and from Lincoln and Omaha and free transportation within those cities. She was involved in three parenting programs, attended individual counseling in both cities, and was provided social services caseworkers in Lincoln and Omaha, a public health nurse, various public assistance funds, housing lists, and supervision during her visits with her child. We find no evidence in this record to indicate that D.C.C. was denied any services to which she was entitled.

In the final analysis, the appellant, damaged beyond measure by a cruel childhood, seeking approval by the only method she knew, i.e., abusive relationships, possessed of deep feelings of inferiority, only barely capable of coping with her own life, could not satisfactorily demonstrate an ability to meet the emotional needs of a child. That she failed to demonstrate even a minimal ability to care for a child in anything approaching a civilized standard is obvious. That she was

probably foreordained to failure, even with the efforts of the massive social machinery, is also obvious. The courts can only deal with reality. They cannot change the past, and can only hope, by timely action, to avoid repetition of the tragedy into another generation. Termination of D.C.C.'s parental rights, however harsh, is the only hope for the child.

Finally, appellant alleges that the juvenile court allowed the guardian ad litem to prosecute this termination case, in violation of Neb. Rev. Stat. § 43-272.01(2) (Cum. Supp. 1986), which states, inter alia, "The guardian ad litem . . . is not appointed to prosecute or defend the parents . . . but shall defend the legal and social interests of such juvenile."

Appellant's allegations seem to be based on two factors: first, that the State only called two witnesses in the July and August proceedings, and the guardian ad litem called five witnesses. Second, it is alleged that absent testimony from at least three of the five witnesses on behalf of the child which related to D.C.C.'s parental fitness, there would be insufficient evidence to meet the State's burden of proof.

We find no merit to this assigned error. Clearly, the guardian ad litem has the authority to "present evidence and witnesses and cross-examine witnesses at all evidentiary hearings . . . ." § 43-272.01(2)(e).

The fact that the guardian ad litem called more witnesses than the State, which filed this petition, is irrelevant. This is not a contest where whoever calls the most witnesses wins.

As to the substance of the guardian ad litem's witness testimony, it is only logical that evidence adduced by the guardian ad litem, when defending the interests of his ward, may implicate the fitness of the parent. If the guardian ad litem determines that the termination of parental rights best serves the child's interests, then the evidence produced may reflect unfavorably upon the parent. If such evidence is introduced, any party to the proceeding is entitled to the benefit of that evidence, even the State.

The judgment of the juvenile court is affirmed.

AFFIRMED.