IN RE INTEREST OF J.D.M., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLANT, V. M.M. ET AL., APPELLEES.
430 N.W.2d 689

Filed October 28, 1988. No. 87-1007.

Charles W. Campbell, York County Attorney, for appellant.

Kevin V. Schlender and Michael Powell for appellee M.M.

George E. Brugh for appellee V.M.

Bruce E. Stephens, guardian ad litem.

HASTINGS, C.J., WHITE, and CAPORALE, JJ., and REAGAN, D.J., and COLWELL, D.J., Retired.

WHITE, J.

This is an appeal by the State of Nebraska from an order of the county court for York County, juvenile division, which dismissed the supplemental petition to terminate the parental rights of the natural father, M.M., to his child J.D.M., pursuant to Neb. Rev. Stat. § 43-292(5) (Reissue 1984). The mother, V.M., voluntarily relinquished her parental rights prior to oral argument; therefore, her rights are not at issue in this appeal.

Appellant asserts that the court below erred in (1) finding that the State had failed to prove by clear and convincing evidence that the father, M.M., was unable to discharge parental responsibilities because of mental illness or mental deficiency as set forth in § 43-292(5), and (2) failing to find that it was in the best interests of J.D.M. to terminate the father's parental rights.

In an appeal from a judgment regarding termination of parental rights, the Supreme Court tries factual questions de novo on the record, and we are thus required to reach a conclusion independent of the trial court; however, where the evidence is in conflict, we consider and may give weight to the

trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *In re Interest of D.C.*, 229 Neb. 359, 426 N.W.2d 541 (1988); *In re Interest of M.R., J.R., and N.R.*, 228 Neb. 47, 420 N.W.2d 924 (1988); *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988).

The factual background of this case is disturbing. At the time J.D.M. was born, on October 17, 1986, his father and mother were incarcerated due to convictions of felony child abuse. These convictions arose out of abuse they inflicted on their first child, E.M.

The abuse toward E.M. began when the child was between 1 and 2 weeks old. At this time, M.M. began spanking the child when the child cried. M.M. also employed other methods in an attempt to punish the infant for crying. For example, M.M. slit a nipple on the child's milk bottle to cause the milk to rush out of the bottle, choking the child. At other times, if the child cried while in his carriage, M.M. would spin the carriage around rapidly in an effort to make the infant cease crying. However, the incident of abuse that led to E.M.'s permanent injuries and the resultant convictions for child abuse occurred when E.M. was 5 weeks old.

Shortly after Thanksgiving in 1985, M.M. and V.M. began fighting. Their shouting woke up the child. In an attempt to quiet the 5-week-old infant, M.M. began to shake the child violently. Dr. Miyazaki, a pediatrician at the University of Nebraska Medical Center, testified that when E.M. was brought in several days later, E.M. had an intercranial hemorrhage due to the trauma from being shaken vigorously. This violent shaking by M.M. had caused the tearing of a blood vessel within the skull and the resultant hemorrhaging.

In addition to shaking the child at this time, both parents spanked the child in a further attempt to quiet E.M. Finally, while M.M. was spanking the infant, V.M. grabbed E.M. and threw him against a wall. The infant fell from the wall onto some stereo speakers. The infant was then put back into bed, and the parents continued to argue. Once again E.M. awoke and began to cry. M.M. took the infant and punched him in the back with his fist, causing the child to scream out in pain. M.M. then placed E.M. on the bed and whipped the 5-week-old infant

with his belt. In response to this onslaught of abuse, the child continued to cry until M.M. finally raised the child, holding the baby under his arms, and violently shook him back and forth. Approximately an hour later the infant went to sleep.

The next day the child began to show the effects of the violent abuse of the night before. The child did not wake up as usual and within a few days stopped eating. E.M. also began to have seizures. In spite of manifestations of injury, E.M. was not taken to the hospital until approximately a week later. V.M. testified that she waited to take E.M. because M.M. said if she took the baby to the hospital she would never see M.M. or E.M. again.

As a result of this abusive treatment, E.M. was diagnosed as suffering from an intercranial hemorrhage, a skull fracture, a fracture to the left clavicle, and a left distal femoral fracture. Additionally, the child was suffering from anemia resulting from significant bleeding and severe brain damage. The prognosis for E.M. is not hopeful. E.M. may be totally blind in one eye and damaged in the other due to hemorrhaging in the child's retinas. Approximately 2 months prior to the termination hearing, E.M. was noted to suffer from symptoms of severe mental retardation, to be in continual pain, and to suffer from personality development problems. Dr. Miyazaki testified that the child would continue to suffer from these handicaps throughout his life.

The juvenile court found that the State had not met its burden of proving by clear and convincing evidence that M.M. has a mental illness or mental deficiency, as required by § 43-292.

Apparently, the juvenile court was concerned regarding the definition of "mental illness or mental deficiency," as set forth in § 43-292(5). Section 43-292(5) provides for termination of parental rights if it is found that "[t]he parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period."

The expert testimony in this case does suggest that M.M. does not suffer a mental illness or deficiency as those words are

commonly known in psychological terms. Dr. Balters, a clinical psychologist, testified that, as psychologically defined, mental deficiency means mental retardation, and Dr. Balters did not find M.M. to be mentally retarded. Dr. Balters also testified that mental illnesses are reserved for those who have disturbed interactions with reality, and he did not find M.M.'s condition to be within this definition of mental illness.

Instead of utilizing the term "mental illness" or "mental deficiency," Dr. Balters testified that M.M. has a personality disorder with problems of impulse control. M.M.'s personality disorder is manifested by rendering him incapable of sustaining the kinds of stress that others contend with, and he reacts to such stress by acting out violently. Finally, Dr. Balters testified that in his opinion M.M. was not amenable to treatment because he was unlikely to learn from therapy. It was Dr. Balters' position that it was remotely possible for M.M. to change after approximately 5 years of treatment but that, in his opinion, the people who do change after treatment have more intelligence and motivation than M.M.

This court has not required a mental health expert to testify in a termination case brought pursuant to § 43-292(5) that the parent suffers from a condition labeled by psychologists as a "mental illness" or "mental deficiency." See *In re Interest of R.L.T.*, 221 Neb. 251, 376 N.W.2d 310 (1985). In *In re Interest of R.L.T., supra*, this court affirmed the termination of a mother's parental rights based on testimony that she suffered from a personality disorder likely to last for an indefinite period. There was no testimony that she suffered from a "mental illness" or "mental deficiency" per se.

It is this court's responsibility to interpret the statutory language of § 43-292(5). While we decline to adopt an absolute definition of the term "mental deficiency," we hold that the term certainly encompasses the mental condition of M.M. in this case. Where a personality disorder is manifested by acts of extraordinary violence, as in this action, the mental condition certainly rises to the level of mental deficiency. To hold otherwise would be absurd. It is difficult to imagine that the Legislature, in adopting a child protection statute, did not intend to terminate the parental rights of a parent who abuses a

child to such a degree as to render a 5-week-old infant permanently brain damaged, merely on the basis that "mental deficiency" is not understood by psychologists to cover a condition other than mental retardation.

The Supreme Court of New Hampshire held a similar view in *In re Doe*, 123 N.H. 634, 465 A.2d 924 (1983). New Hampshire has a statute with language very similar to § 43-292(5). N.H. Rev. Stat. Ann. § 170-C:5(IV) (Supp. 1981) of the New Hampshire child protection statutes provides that parental rights may be terminated if the court finds that "[b]ecause of mental deficiency or mental illness, the parent is and will continue to be incapable of giving the child proper parental care and protection for a longer period of time than would be wise or prudent to leave the child in an unstable or impermanent environment." In *In re Doe, supra,* the father was diagnosed as suffering from a personality disorder. The father contended that a personality disorder is not a "mental illness" as contemplated by the Legislature when the New Hampshire termination statute was enacted. The New Hampshire court did not feel constrained by the definition of "mental illness" utilized by psychiatrists. The court stated, "We do not believe that one who has physically abused a young child can argue that a child-protection statute which provides for the termination of parental rights on grounds of mental illness does not implicitly encompass mental illnesses which manifest themselves in abusive or violent conduct." 123 N.H. at 642, 465 A.2d at 930. Similarly, we do not believe that one who has physically abused a young child can argue that a child protection statute providing for the termination of parental rights on grounds of mental deficiency does not encompass mental deficiencies which manifest themselves in violent and abusive conduct. Therefore, we hold M.M.'s personality disorder to be within the definition of "mental deficiency" as that term is used in § 43-292(5).

Moreover, the record contains sufficient evidence establishing that this disorder will continue for a prolonged indeterminate period, as required for termination pursuant to § 43-292(5). Dr. Balters testified that he did not believe M.M. was amenable to treatment. Dr. Balters also testified regarding M.M.'s lack of remorse for the injuries he inflicted on his

first son, E.M., and his lack of motivation to pursue treatment.

Finally, although M.M. has had no unsupervised contact with J.D.M. and therefore J.D.M. has not been abused in any way, that does not change our opinion in this case. It is not necessary that the court await the time that the child shows permanent scars of his father's anger and impulsivity before acting to terminate the relationship. *In re Interest of R.L.T., supra.* There is no need to provide M.M. with the opportunity to abuse his second child.

From a de novo review of the record, we hold that it has been established by clear and convincing evidence that M.M. now suffers from a personality disorder likely to last for an indefinite period and which is likely to subject his child to physical injury and that it is in the best interests of the child to terminate the parental rights of M.M.

The judgment of the lower court is therefore reversed.

REVERSED.