IN RE INTEREST OF D.L.S., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. J.S.C., APPELLANT.
432 N.W.2d 31

Filed November 23, 1988.    No. 87-858.

Kevin V. Schlender and Michael Powell, guardian ad litem of J.S.C., for appellant.

Charles W. Campbell, York County Attorney, for appellee.

Bruce E. Stephens, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

In this termination of parental rights case, the father voluntarily relinquished his rights in and to his now 3-year-old daughter, D.L.S. The county court, in the exercise of its powers as a juvenile court, then terminated the mother's parental rights in and to said child. The mother has appealed. Her guardian ad litem and her daughter's guardian ad litem have both aligned themselves with the mother. The errors assigned by and on behalf of the mother combine to challenge (1) certain evidentiary rulings, (2) the reasonableness of the plan of rehabilitation, and (3) the sufficiency of the evidence to support the judgment of termination. We affirm.

The child originally came to the attention of the Nebraska Department of Social Services when her parents brought her into a medical clinic at York, Nebraska, on July 7, 1986, because of a soft lump on the then 14-month-old's head. The physician examining the child discovered a skull fracture, but found no other bruises and no evidence of trauma or brain damage. At that time the parents told the physician they were not sure how the child's injury occurred. The physician testified that he had delivered the child and that until the head injury, she

had been receiving "very good care"; "the child was very clean, well fed. The clothes were clean. The child was usually dressed up in a very nice outfit." There had, however, been some problems with overfeeding and with ear infections.

As a consequence of the report of the head injury by the clinic, a petition was filed alleging the child was within the purview of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1986) by virtue of being in a situation dangerous to life or limb or injurious to her health and morals, and thus was within the jurisdiction of the juvenile court.

Investigation revealed that the house in which the child lived with her parents was unsanitary in the extreme, and the child was placed in the temporary custody of the department. Following a series of hearings, the court below, on October 24, 1986, ordered that the mother, who is in her midtwenties, rehabilitate herself, so that she might be reunited with her daughter, by meeting a number of requirements within 90 days. The court reimposed essentially the same requirements on January 21, 1987, again to be accomplished within 90 days. These requirements, in summary, were that she (1) cooperate with the department in visiting her daughter and in taking instruction calculated to turn her into a competent parent, (2) secure psychotherapeutic services as deemed necessary by a designated clinic and as directed by the department, (3) secure and maintain steady employment so as to support herself and her child, (4) maintain an appropriate permanent residence for herself and her child, and (5) decide what to do about her relationship with her husband, the child's father.

On May 15, 1987, the State petitioned for termination of the mother's parental rights, pursuant to the provisions of Neb. Rev. Stat. § 43-292 (Reissue 1984), asserting, on the one hand, that the mother had "substantially and continuously or repeatedly" neglected the child and refused to give her necessary parental care and protection and, on the other hand, that she was incapable of proper parenting "because of mental illness or mental deficiency" which was reasonably believed would "continue for a prolonged indeterminate period." The petition also avers that reasonable efforts made under the supervision of the court below failed to remove the conditions

which endangered the child's life, limb, health, or morals, and concluded that termination of the mother's rights would be in the child's best interests.

In turning our attention to the claims of evidential error, we begin by recalling that the Nebraska Evidence Rules, Neb. Rev. Stat. §§ 27-101 to 27-1103 (Reissue 1985), do not apply in juvenile court dispositional hearings such as one to terminate parental rights. Neb. Rev. Stat. § 43-283 (Reissue 1984); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). See, also, *In re Interest of J.K.B. and C.R.B.*, 226 Neb. 701, 414 N.W.2d 266 (1987). However, a proceeding to terminate parental rights must employ fundamentally fair procedures satisfying the requirements of due process, at which parents are entitled to cross-examine adverse witnesses. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Interest of J.S., A.C., and C.S., supra*; *In re Interest of J.K.B. and C.R.B., supra*; *In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987). Therefore, the requirements of due process control a proceeding to terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. While the Nebraska Evidence Rules do not apply, they provide guidance in determining the type of evidence which meets due process requirements.

The mother's first evidential concern focuses on the receipt into evidence of sundry reports dealing with the mental and physical condition and treatment of the child's father and one of the mother's boyfriends. The mother contends these documents were improperly received in evidence because they are not relevant and because they contain hearsay statements prejudicial to her, including the statements that the child was in foster care because of abuse and the father's claim that the mother was promiscuous. Assuming that it was error to receive these reports in evidence, the error was harmless and thus provides no basis for reversing the judgment of the court below, for error without prejudice provides no ground for appellate relief. *In re Interest of J.K.B. and C.R.B., supra*.

No prejudice resulted because there was other evidence that the child suffered a skull fracture and that the mother had not

been an adequate parent. Although at the termination hearing the father stated he did not know how his daughter was injured, he at one point prior to the hearing wrote a note saying he had caused his daughter's head injury by striking her with his ring finger. There is no evidence or claim that the mother in any way herself abused the child, but two psychologists testified that the mother suffers from a dependent personality disorder. The first psychologist testified that as a consequence, the mother allows others to assume responsibility for major areas of her life and will leave major parenting decisions to others. Both psychologists were concerned that the mother would choose a boyfriend or spouse who would take control even if such relationship were harmful to the child. The second psychologist nonetheless expressed the opinion that the mother was capable of protecting her daughter from day-to-day dangers. One of these psychologists opined that with therapy which could take as long as 2 years, the mother "could" overcome her dependent personality disorder. The other expressed the opinion that the dependent personality condition was "potentially" treatable with long-term therapy over an indeterminate period of time.

The mother's second evidential complaint is that a self-employed clinical social worker was permitted, over objection, to testify, based on reports of three psychologists, the two psychologists mentioned earlier and another with whom the social worker maintained a professional relationship, that the mother suffered from a mental deficiency, a "brain dysfunction," which would prevent her from ever acquiring adequate parenting skills. While this social worker at one point testified that both she and the psychologist with whom she maintained a "liaison" went over various psychological tests and the reports of the two other psychologists, one of whom specifically ruled out any "intellectual deficiency," it was the psychologist with whom she was professionally related who "interpret[ed] all of the psychological tests," as the social worker was not herself competent to do so. Thus, the social worker was not expressing her own opinion as to the existence of a brain dysfunction, by which statement we do not mean to suggest the record establishes she is qualified to make such a diagnosis, but in reality was merely parroting her

professionally related psychologist's thoughts. Since a parent has the right to cross-examine an adverse witness appearing in a proceeding to terminate her parental rights, the mother correctly contends that by presenting the social worker's related psychologist's thoughts in this hearsay fashion, the State impermissibly deprived her of the opportunity to cross-examine the absent psychologist. *In re Interest of J.K.B. and C.R.B.*, 226 Neb. 701, 414 N.W.2d 266 (1987); *In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987).

This determination, however, does not end our inquiry, for in a termination of parental rights case, this court tries the factual issues de novo on the record and reaches a conclusion independent of the trial court; provided, that when the evidence is in conflict, we consider and may give weight to the trial court's observation of the witnesses and its acceptance of one version of the facts rather than another. *In re Interest of A.Z., B.Z., and R.Z., post* p. 291, 430 N.W.2d 901 (1988); *In re Interest of J.D.M., ante* p. 273, 430 N.W.2d 689 (1988); *In re Interest of Z.D.D. and N.J.D., ante* p. 236, 430 N.W.2d 552 (1988); *In re Interest of D.C.,* 229 Neb. 359, 426 N.W.2d 541 (1988). See, also, *In re Interest of L.O. and B.O.,* 229 Neb. 889, 429 N.W.2d 388 (1988). In such de novo review, we must disregard impermissible or improper evidence, *In re Interest of A.Z., B.Z., and R.Z., supra,* and *In re Interest of J.S., A.C., and C.S.,* 227 Neb. 251, 417 N.W.2d 147 (1987), even if the mother had not assigned the admission of such evidence as error, provided that, as is true in this case, an appropriate objection was made at trial. Thus, we must consider whether the evidence independent of the clinical social worker's testimony clearly and convincingly, *In re Interest of J.S., A.C., and C.S., supra* (citing *Castellano v. Bitkower,* 216 Neb. 806, 346 N.W.2d 249 (1984)), establishes grounds for terminating the mother's parental rights.

Since a parent's failure to make reasonable efforts to comply with a court-ordered plan of rehabilitation designed to reunite the parent and child presents an independent reason justifying termination of parental rights under § 43-292(6), *In re Interest of A.Z., B.Z., and R.Z., supra*, and *In re Interest of L.O. and B.O., supra*, we begin by considering the plan and the mother's

performance with respect to it.

As to the first aspect of the plan, that the mother cooperate with the department in visiting her daughter and in taking instruction calculated to turn her into a competent parent, the evidence establishes that the mother did cooperate with the department in visiting her daughter and did take the required instruction. The evidence also establishes, however, that although the mother has shown some improvement in her parenting ability, she has not succeeded in applying much of what she has been taught. A social worker employed by the department testified that at the time she saw the mother's residence, it met "minimal standards" but nonetheless "would have had to have been much cleaner to allow unsupervised visits."

The evidence shows that the mother bought the child gifts, had her room redecorated, and greeted her warmly during visits. While initially the child was excited to visit with her mother, as time went on the child became less affectionate toward her mother. On at least one occasion, discipline was observed to break down to the point that the mother and daughter "verbally attack[ed] each other," and many of the mother's comments to the child were negative or neutral. The same social worker who found the mother's residence to meet no more than minimal standards was also of the opinion that the mother had difficulty meeting her daughter's physical, emotional, and intellectual needs and would never be able to provide the child with a stable environment. Following the recent visits with her mother, the child became hyperactive, buried herself in play, cried herself to sleep, lost her appetite, had nightmares, and took a couple of days to return to normal. What is not clear from the record is whether this reaction was the result of the child's interaction with her mother or, rather, was the result of sorrow at being separated from her mother.

The mother attacks the reasonableness of the second aspect of the plan, that she secure psychotherapeutic services as deemed necessary by a designated clinic and as directed by the department, by arguing that the court below impermissibly abdicated its judicial responsibility by leaving the nature and frequency of the therapy to be administered to the discretion of

the clinic and department. The attack is well founded. Although a juvenile court judge certainly cannot be expected to diagnose a parent's condition, determine whether treatment is indicated, and then design a course of treatment, any treatment made a part of a rehabilitation plan must be specifically ordered by the court. *In re Interest of M.L.B.*, 221 Neb. 396, 377 N.W.2d 521 (1985); *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985). In this way, the juvenile court can assure itself that the treatment recommended is reasonably related to the rehabilitative objective of its plan. *In re Interest of L.O. and B.O.*, 229 Neb. 889, 429 N.W.2d 388 (1988); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

Notwithstanding the legal infirmity of the subject aspect of the plan, the fact remains that the mother did undergo the psychotherapy as required by the designated clinic and the department. Contrary to the mother's claim that such therapy had nothing to do with her dependent personality disorder, the evidence is that part of the therapy was directly aimed at helping her make decisions on her own. The lack of that ability is the essential feature of the disorder in question.

The plan next required that the mother secure and maintain steady employment so as to support herself and her child. The record shows that by the time of the termination hearing, the mother had obtained part-time employment as a waitress, earning minimum wages and gratuities.

The plan also required that the mother maintain an appropriate residence for herself and her child. The evidence establishes that the mother was more peripatetic than most, having moved four times in a 10-month period. However, each residence provided space, bedding, and furnishings for her daughter. At the time of the termination hearing, the mother was maintaining a household in an apartment she was sharing with her sister.

Finally, the plan required that the mother decide what to do about her relationship with her husband, who was abusive toward both her and the child. The evidence is that she decided to dissolve the marriage, and did so.

This brings us, then, to the question of whether the evidence

establishes the grounds for termination of the mother's parental rights as alleged in the State's petition; that is, does the evidence establish that the mother (1) continuously or repeatedly neglected or refused to give her daughter necessary care and protection, and, if so, (2) failed to substantially comply with the juvenile court's plan to rehabilitate her to a condition whereby she and her daughter, consistent with the latter's well-being, could be reunited, or, if not, (3) suffers from a "mental illness or mental deficiency" which is reasonably believed will "continue for a prolonged indeterminate period"?

The evidence convinces us the mother gave her child such care and protection as her abilities enabled her to provide. Thus, we must conclude the evidence fails to establish the State's first ground for termination.

Neither does the evidence establish that the mother failed to comply with the juvenile court's plan of rehabilitation. She did substantially all that was required of her, albeit she failed to obtain employment as quickly as directed. She took all the training and therapy she was directed to take. While the housing she maintained met no more than minimum standards, it cannot be said that housing which meets minimum standards provides a basis for terminating parental rights. She dealt with her relationship with her husband by divorcing him. Thus, the evidence fails as well to establish the State's second ground for termination.

The third and last ground for termination, however, is another matter. The evidence establishes that although the mother did what the plan of rehabilitation required of her, she remained substantially incapable of applying what she was taught. She was not unwilling to do what was asked in an effort to learn to become a competent parent, but she found herself unable to acquire the requisite skills. While the record ascribes no specific reason for the existence of this lack of learning ability, there is no question but that it is present. Expert evidence is not required to establish matters which are self-evident. See *Johannes v. McNeil Real Estate Fund VIII*, 225 Neb. 283, 404 N.W.2d 424 (1987). Thus, notwithstanding the lack of expert opinion that the mother suffers from a "mental deficiency," the evidence compels the conclusion that

such a deficiency nonetheless exists. See, also, *In re Interest of J.D.M., ante* p. 273, 430 N.W.2d 689 (1988); *In re Interest of R.L.T.,* 221 Neb. 251, 376 N.W.2d 310 (1985).

In the context of a statute which permitted the sterilization of "mentally deficient" patients seeking release from a certain state institution, we said the statute referred to those who were "feeble-minded" or "mentally retarded." *State v. Cavitt,* 182 Neb. 712, 157 N.W.2d 171 (1968), *reh'g denied* 183 Neb. 243, 159 N.W.2d 566, *appeal dismissed* 396 U.S. 996, 90 S. Ct. 543, 24 L. Ed. 2d 490 (1970). Whatever "feeble-minded" or "mentally retarded" may mean in its various contexts, we hold that as used in § 43-292(5), "mental deficiency," as distinguished from "mental illness," includes an impairment in learning capacity such that one is unable to profit from instruction and acquire parenting skills. See *Halderman v. Pennhurst State School & Hospital,* 446 F. Supp. 1295 (E.D. Pa. 1977), *modified* 612 F.2d 84 (3d Cir. 1979).

Having made that determination, it is necessary to remind ourselves that the foremost purpose and objective of the Nebraska Juvenile Code is the promotion and protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with her or his parents where the continuation of such parental relationship is proper under the law. *In re Interest of J.S., A.C., and C.S.,* 227 Neb. 251, 417 N.W.2d 147 (1987). Thus, the crucial question becomes whether the determination that the mother suffers from a mental deficiency in the previously reviewed context clearly and convincingly establishes that it is in the daughter's best interests that her mother's parental rights be terminated. We must conclude that the record does so establish.

There is no evidence whatsoever regarding the curability of the mother's mental deficiency as such. To the extent it can be inferred the mother's inability to learn is but a component of her dependent personality disorder, the evidence is only that the disorder is potentially treatable and only that the disorder "could" be overcome. No psychologist expressed an opinion based on reasonable psychological certainty that the mother's disorder would be cured.

Psychological evidence based on possibility is no less

speculative and conjectural than like testimony by other experts. Just as we require medical opinions to be based on reasonable medical certainty, *Caradori v. Frontier Airlines*, 213 Neb. 513, 329 N.W.2d 865 (1983), so do we require that psychological opinions be based on reasonable psychological certainty.

Moreover, even to the extent the disorder is theoretically treatable, assuming that to mean it is curable, the record tells us that the treatment would extend over an indeterminate period. The only concrete suggestion is that treatment would take another 2 years. We cannot gamble away an additional 2 years of this child's life on the speculative hope that the mother can overcome the deficiency which she, albeit through no fault of her own, brought to motherhood. As we have noted in the past, a child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. *In re Interest of Z.D.D. and N.J.D., ante* p. 236, 430 N.W.2d 552 (1988); *In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987). See, also, *In re Interest of J.D.M., supra.*

AFFIRMED.

FAHRNBRUCH, J., concurs in the result.

GRANT, J., concurring.

I concur with the result reached by the majority, but I base my judgment that the parental rights of J.S.C., the mother of D.L.S., should be terminated on somewhat different and broader grounds than does the majority opinion.

The first of the mother's "evidentiary errors" concerns the receipt into evidence of various reports concerning the mental health commitments of the mother's husband and her boyfriend. J.S.C. had divorced her husband at some time between the time the child in question was removed from her mother and father and the time of the termination hearing. The mother's boyfriend had been the companion with whom she lived for some months during the same period of time. The majority opinion dismisses this evidentiary problem, stating that the error, if any, in receiving such evidence was harmless, in that there was other evidence about the injury to the child.

In my opinion, the evidence was admissible and important in

the trial court's decision. It was established, beyond question, that the mother suffered from a dependent personality disorder. There was credible testimony that as a result of this condition the mother allows others to assume responsibility for major areas of her life and will leave major parenting decisions to others. Since this is the case, it would seem to be important to determine with whom the mother was living during the 13-month time in question (between the removal of the child and the termination hearing), since those persons may well be responsible in the major areas of the mother's life and could well be making parental decisions if the child were placed with the mother.

The foundation as to these exhibits was waived. The exhibits were objected to at the trial on the basis of relevance and because the exhibits contained hearsay about the mother's relationship with her husband and her boyfriend. At this point, considering only the relevancy of the exhibits, I have no difficulty in determining they were relevant. The four exhibits complained of showed, in part, that the husband was placed in the Hastings Regional Center on October 28, 1986, for treatment of severe alcohol problems culminating in a suicide attempt (by wrist-slashing, requiring eight stitches). The husband was determined to be dangerous to himself at that time. He was released from the regional center on November 21, 1986, returned to the residence of J.S.C., and was admitted to the Lincoln Regional Center on November 28 because of another suicide attempt resulting from an overdose of drugs. This attempt required the pumping of the husband's stomach. At this point, the husband told the treating authorities that he felt he was a danger to others because when he loses his temper, he becomes violent. This fact was corroborated in the testimony of J.S.C. The husband was found to be dangerous to himself and to others at this time. He was discharged on January 21, 1987. It seems to me those facts are relevant when the trier of fact is in the process of determining if this child should be returned to the mother.

Similarly, in connection with the exhibit concerning J.S.C.'s boyfriend, with whom she took up residence at some time before the husband's admission to the Lincoln Regional Center

in November of 1986, the report shows that on June 8, 1987, this man was admitted to the Hastings Regional Center after commitment from the York County Mental Health Board. One week before that commitment, the boyfriend had been taken to the Lincoln Regional Center because of suicide threats. At that time, it was determined that this man's problem was based on alcohol and drug abuse. He had been in the Hastings Regional Center in September of 1986 for the same problems. The man was apparently discharged from the second treatment on June 30, 1987. Testimony from the mother during the trial established that this person also was physically violent with her and others while they were together. Again, I think it was relevant to consider the characteristics of this person who was apparently in charge of the mother's life for many months prior to the termination hearing.

It might also be noted that the trial court received similar evidence to show that a man who resided with the mother and her boyfriend (along with the visitor's girlfriend, the girlfriend's infant child, and occasionally the girlfriend's two brothers) in the summer of 1987 was on probation from a felony conviction. This evidence was objected to on the ground of relevance but was not made the subject of an assignment of error. I think this evidence was also relevant for the reasons set out above.

I agree generally with the majority's treatment of the evidence adduced from a social worker who submitted opinions based on reports of three psychologists, but I believe that only the testimony based on the opinion of the one psychologist who was not called as a witness in the hearing should be ignored. The social worker herself made valid factual observations which were properly admitted, and the other two psychologists testified. The testimony of the witness in question was proper, except as to all testimony concerning opinions of the missing psychologist.

Insofar as the majority opinion sets forth the factual issues to be tried de novo in this court, I believe the record contains many facts which must be considered. First of all, the physician who treated the child's skull fracture did testify that the child had received "very good care," but he testified on cross-examination that he was not aware of the poor and

extremely unclean condition of the child's home when picked up, nor was he aware of the father's mental illness nor the mother's personality disorder. The doctor's opinion as to "good care" is certainly not controlling on the disposition of this case.

With regard to the trial court's finding that termination of parental rights was in the child's best interests, the trial court also had before it, as do we, testimony that when the husband was discharged from the Hastings Regional Center on November 21, 1986, he stayed with the mother and boyfriend. This situation "caused problems," and the father again attempted suicide, resulting in the father's admission into the Lincoln Regional Center on November 28, 1986.

At a later time, the mother described her living conditions in May of 1987, when she was living in a trailer court with her boyfriend Bill, and testified:

Well, at the end of May my ex-husband [the father of the child] came up with his girlfriend and my ex-husband started to drink and he was doing something to his girlfriend — trying to strangle her because she would not give him the keys so he could go back to Lincoln. And Bill seen him strangle her and Bill pulled [the husband] off of there — off of her. And [the husband] hit Bill and Bill hit [the husband] and [the husband] fell to the ground. We got kicked out of the trailer park.

The mother admitted to a social worker therapist, who was counseling with the mother, that she did not know why she is attracted to people who engage in drinking, get into trouble with the law, and maintain adversary relationships with other authority figures. This witness testified, on cross-examination, that the mother has a "sense of excitement" in being involved with such people. This therapist further testified that sort of attraction is not likely to change in the future, because the mother relies heavily on impulse, wants to have a close relationship with a man, and wants to have attention.

This witness' observations are reflected in the facts of this case. The mother divorced the father of her child because he was violent, abusive, physically assaulted her, attempted suicide twice, and had a severe alcohol problem.

While the mother of this child was apparently legally married

to one man throughout these proceedings, she was also intimately involved with another—also throughout the proceedings—up to a month or two before the hearing. As the mother began to rid herself of one abusive, violent, alcoholic partner (her husband), she immediately, if not sooner, moved in with another violent, abusive, alcoholic, drug-taking partner, who also beat her and attempted to commit suicide. I cannot see that this progression of events shows the mother is improving in her ability to parent this child.

The facts on J.S.C.'s dissolution of marriage are not in the record, but it can be approximately calculated that the divorce apparently was to become final in approximately October of 1987. If that is so, the dissolution decree would have been signed in approximately April of 1987, and the action begun at least 60 days before that. It is difficult to have to make such approximations, but no facts were presented on this easily provable fact.

In connection with the mother's inviting her ex-husband and his then girlfriend to stay with the mother and her then boyfriend, one psychologist testified that the concern she had about the mother's activities was that the mother did not perceive this situation as a potential problem. Whether one is concerned about the mother's amoral approach to life or not, one would have to be concerned if the mother did not have enough insight to perceive the real possibility of violence arising out of the situation the mother had created. Such violence did, of course, erupt, with the result of eviction from the trailer park residence above referred to.

With regard to the subject of the mother's employment, the record shows that after her graduation from high school, the mother worked for the same employer for 3 1/2 years. She quit her employment only when she became pregnant with D.L.S. She is obviously employable, but she did not work during the 13 months in question when D.L.S. was being cared for by others. The record does not show how J.S.C. provided for her own existence during this time. She did obtain a job 1 week before the termination hearing. I believe the mother's activities with regard to employment, which was ordered by the court in an attempt to let the mother prove that she could become an

independent parent, show that the mother does not intend to exert herself to provide her child a safe home.

With regard to the trial court's requirement that the mother maintain an appropriate residence for herself and the child, the residences which the mother provided, up to the time she moved in with her sister, have been generally referred to and described above. I do not believe that any of these residences provided appropriate space, bedding, or furnishing for her child, with the exception of the apartment referred to in the next paragraph.

The mother's ability to maintain a clean residence was explained by the mother to a protective services worker with the Department of Social Services in York. In one of J.S.C.'s residences after leaving her husband, she resided in an apartment. When the protective services worker was unable for some period of time to talk to the mother at the apartment, she indicated to him that she had not been living in the apartment because she wanted to keep it clean; she felt if she did not live there it would not get dirty; and then when the protective services worker came to see the apartment, he would find it clean. The mother informed him that she spent the nights and some daytime hours at the apartment of a friend in the same apartment building.

With regard to the mother's visitation, I find no indication in the record that the mother initiated any visitation. The social worker who supervised the foster parent placement for the child arranged for much of the visitation. It appears that the child was brought to the mother's various residences, but none of them were clean enough to enable the child to be left with the mother all day unless there was supervision. Neither could the child be left overnight with the mother.

I believe that the evidence clearly and convincingly establishes grounds for the termination of the mother's parental rights and that the trial court and this court have reached a legally correct result. In fact, I cannot think it remotely proper to subject this helpless baby, growing into a vulnerable little girl, to an environment where violence, abuse, alcohol, and drugs reign supreme, and where no one appears to be able or willing to defend this helpless little human being from the hazards that

inevitably flow from such conditions.

HASTINGS, C.J., and BOSLAUGH, J., join in this concurrence.

CAPORALE, J., dissenting.

I must dissent, for while I do not suggest the mother should be given immediate possession and custody of her daughter, the record, in my mind, demonstrates she has made sufficient progress to warrant granting her additional time within which to attempt further improvement.

When all is said and done, the majority forever severs the natural and constitutionally protected relationship between a young mother and her infant daughter because discipline broke down on at least one occasion; because the child reacts with some agitation after visiting with her mother; and because, in the opinion of a social worker, the mother has experienced difficulty meeting the daughter's physical, emotional, and intellectual needs and will never be able to provide the child with a stable environment. Notwithstanding the fact that the record provides us with no information as to why the child reacts as she does after leaving her mother, the majority characterizes the evidence as "clearly and convincingly" establishing that the best interests of the child will be served by immediately turning her into an orphan.

The fact the mother divorced the child's abusive father apparently does not impress the majority; the fact the mother found employment, although later than directed, apparently does not impress the majority; the fact the mother took the myriad other steps she was ordered to take in an effort to improve her abilities as a parent apparently does not impress the majority.

I do not overlook that the mother has thus far not been able to apply all she has been taught about becoming a model parent or that there is no competent evidence that she will be able to do so. The burden, however, is not on the mother to prove she can learn, but on the State to prove that she cannot. It is the State which has the burden of proving by clear and convincing evidence that grounds exist for terminating parental rights; it is not the parent's burden to prove by any evidential standard that no such grounds exist. As this very court has observed:

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures. . . ."

*In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 264, 417 N.W.2d 147, 156 (1987). See, also, *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985); *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981).

I recognize, too, that a child cannot and will not be made to await uncertain parental maturity. *In re Interest of Z.D.D. and N.J.D., ante* p. 236, 430 N.W.2d 552 (1988); *In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987). See, also, *In re Interest of J.D.M., ante* p. 273, 430 N.W.2d 689 (1988). This court has observed, however, that the foregoing principle should not be used to tread upon the rights of either a parent or a child. *In re Interest of L.J., J.J., and J.N.J., supra.* Although the juvenile justice system far too frequently takes much too long to do what obviously must be done, in my view the system has acted far too hastily in this instance, and in so doing has trampled upon the mother's constitutionally protected parental rights.

Clear and convincing evidence has been defined to be that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985); *In re Guardianship of Sain*, 217 Neb. 96, 348 N.W.2d 435 (1984); *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984). The evidence in this case simply does not

rise to that level at this point. As the guardian ad litem for the child suggests, on the record presented the mother is entitled to additional time to learn to be an adequate, if not a model, parent; if more time continues to demonstrate she cannot apply what she is taught, the State will then have the requisite evidence.

In saying that the evidence clearly and convincingly establishes grounds for termination of the parental rights of the mother at this point, the majority, in my view, has used legally correct words to reach a legally incorrect result. As a consequence, the relationship between every parent and child in this sovereign state has been impoverished.

WHITE and SHANAHAN, JJ., join in this dissent.