STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, V. ALAN H. KIRSHEN, RESPONDENT.

441 N.W.2d 161

Filed June 9, 1989.   No. 87-546.

David L. Herzog, Special Prosecutor, for relator.

James L. Rold, of Rold & Peppard, for respondent.

HASTINGS, C.J., BOSLAUGH, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and ENDACOTT, D.J.

PER CURIAM.

This is an original proceeding wherein the Nebraska State Bar Association (NSBA), relator, filed formal charges in this court against respondent, Alan H. Kirshen. The formal charges were based on three separate complaints made to the Counsel for Discipline for the NSBA. Counts I and II of the formal charges allege that respondent failed to timely respond to two of the complaints, in violation of Canon 1, DR 1-102, of the Code of Professional Responsibility. Count III alleges that respondent failed to act competently, failed to represent his client zealously, and charged an illegal or excessive fee in connection with an estate proceeding, in violation of DR 1-102; Canon 6, DR 6-101; Canon 7, DR 7-101; and Canon 2, DR 2-106, of the Code of Professional Responsibility.

These proceedings began before the Committee on Inquiry of the Second Disciplinary District (Committee) on charges filed on September 5, 1986, by Alison L. Larson, Assistant Counsel for Discipline. Five charges were originally filed before the Committee. The three counts tried before the Committee, and later formally charged, alleged that respondent (1) failed to act competently and failed to timely respond to a complaint made by Mrs. Roy Nuttelman; (2) failed to act competently and failed to timely respond to a complaint made by JaVee Suhr, a court reporter; and (3) neglected and failed to timely close the estate of Medalo Tapia and engaged in conduct that adversely reflected on his fitness to practice law in connection with the estate proceedings.

A hearing was held before the Committee on March 18, 1987, on the Nuttelman, Suhr, and estate of Tapia matters. On April 15, 1987, the Committee transmitted to the NSBA Disciplinary Review Board (Board) formal charges against the respondent.

The Board reviewed the record of the Committee hearing with respect to the allegations contained in the formal charges. On June 10, 1987, the Board determined that there were reasonable grounds for discipline and that a reprimand would

not be an appropriate remedy, and submitted the formal charges to this court.

On September 21, 1987, Larson was granted leave to withdraw as attorney for relator because it appeared she would be a witness at the hearing. David Herzog was appointed special prosecutor. On October 13, J. Terry Macnamara was appointed referee. The matter was heard before the referee on June 28 and 29, 1988.

The referee's report was filed on September 7, 1988, and recommended that respondent be suspended from the practice of law for 1 year. Respondent filed exceptions to the report, objecting to the report in numerous particulars and alleging constitutional, evidentiary, and other defects in these disciplinary proceedings.

Respondent further contends that the punishment recommended by the referee was too harsh. For the reasons stated hereinafter, we determine that respondent should be disciplined and that the sanction recommended by the referee was inadequate in view of respondent's actions.

A proceeding to discipline an attorney is a trial de novo on the record, in which the Supreme Court reaches a conclusion independent of the findings of the referee, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987), *cert. denied* ____ U.S. ____, 109 S. Ct. 31, 102 L. Ed. 2d 10 (1988). In its de novo review of the record in a disciplinary proceeding against an attorney, and to sustain a particular complaint against an attorney, the Supreme Court must find that the complaint has been established by clear and convincing evidence. *Id.* In a disciplinary proceeding against an attorney, the basic issues are whether discipline should be imposed and, if so, the type of discipline appropriate under the circumstances. *Id.*

## COUNTS I and II

Count I of the formal charges alleges:

1. That on or about the 16th day of April, 1979, the

Respondent, Alan H. Kirshen, was duly admitted to the practice of law in the State of Nebraska, by the Supreme Court of the State of Nebraska.

2. That on or about April 30, 1986, the Counsel for Discipline received a written letter of complaint against the Respondent by Mrs. Roy Nuttelman.

3. That on or about May 1, 1986, the Respondent received notice that he was the subject of a complaint written to the Counsel for Discipline with an attached copy of Mrs. Nuttelman's complaint. Furthermore, the Respondent, pursuant to the Rules of Disciplinary Proceedings, was notified that he had fifteen (15) working days to send an appropriate written response to Mrs. Nuttelman's complaint to the Counsel for Discipline.

4. That the Respondent failed to timely file a response to the complaint of Mrs. Nuttelman with the Counsel for Discipline's Office.

That the actions of the Respondent, as set forth above, constitute a violation of his Oath of Office, as an attorney licensed to practice law in the State of Nebraska, as provided by Section 7-104 R.R.S. 1977, and are in violation of the following provisions of the Code of Professional Responsibility, to-wit:

DR 1-102 Misconduct.

(A) A lawyer shall not:

1. Violate a Disciplinary Rule.

■ Engage in any other conduct that adversely reflects on his fitness to practice law.

Count II of the formal charges alleges:

2. That on or about February 21, 1986, the Counsel for Discipline received a written letter of complaint against the Respondent by Ms. JaVee Suhr on behalf of Thibault, Suhr & Thibault, Inc., a free-lance court reporting firm.

3. That on or about February 21, 1986, the Assistant Counsel for Discipline wrote to the Respondent and requested a response to Ms. Suhr's letter of complaint. That on or about April 24, 1986, May 20, 1986, and June 11, 1986, the Assistant Counsel for Discipline again notified the Respondent by letter that he was the subject of

a complaint written to the Counsel for Discipline by Ms. Suhr and requested an immediate appropriate response.

4. That the Respondent failed to timely file a response to the complaint of Ms. Suhr.

As in count I, count II further alleges that respondent's actions constituted a violation of his oath of office as an attorney and were in violation of DR 1-102(A)(1) and (6).

In his first amended answer to formal charges, with respect to count I, respondent admitted paragraph 1 and denied paragraphs 2, 3, and 4. He affirmatively alleged with respect to count I that he had timely responded to any notices of complaints he received from and after February 21, 1986, and stated:

6. For further defense, Respondent denies that violation of a duly imposed procedural rule of this Court states facts sufficient to constitute a cause of action for violation of a substantive Disciplinary Rule of the Code of Professional Responsibility of the American Bar Association as adopted by this Court.

7. For further defense, Respondent alleges that Disciplinary Rules DR-102(A), (1 and 6), as pled by the State of Nebraska, Nebraska State Bar Association, District Two Committee on Inquiry are unconstitutionally vague and overbroad, as applied to Respondent, under both the Fourteenth Amendment to the United States Constitution and Article I, Section 3 of the Constitution of the State of Nebraska.

As to count II, respondent denied paragraphs 2, 3, and 4. He affirmatively alleged that he responded to any notices of complaints he received from and after May 1, 1986, and stated:

6. For further defense, Respondent denies that violation of a duly imposed procedural rule of this Court states facts sufficient to constitute a cause of action for violation of a substantive Disciplinary Rule of the Code of Professional Responsibility of the American Bar Association as adopted by the Court.

7. For further defense, Respondent alleges that the District Two Committee on Inquiry found that the failure to pay a disputed deposition bill did not form the basis of a

substantive complaint against a member.

8. That such substantive complaint should have been dismissed if received by the Counsel on Discipline since such conduct, if true, has never been understood to form the basis of a disciplinary violation.

9. That the Counsel on Discipline, or his subordinates, employees and agents, if any were involved, exceeded their authority and duties under Rule 8 of the Disciplinary Rules of the Nebraska Supreme Court in pursuing Respondent over a disputed deposition bill.

Respondent attended law school at the University of Chicago from 1968 through 1971 and was admitted by examination to the Iowa bar. He spent 6 years "processing fraudulent things for the Federal Government." He was admitted to the bar in Nebraska on motion in 1979.

With respect to count I, the record shows that on April 30, 1986, Counsel for Discipline, Dennis G. Carlson, received a written complaint from Mrs. Roy Nuttelman, whom respondent formerly represented in a farm bankruptcy proceeding. Carlson forwarded the Nuttelman complaint to respondent on April 30, 1986, by certified mail. Carlson's letter further informed respondent that "[p]ursuant to Rule 9 (E) of the Rules of Disciplinary Proceedings, you are required to send to me an appropriate written response within the next fifteen (15) working days. If you fail to so respond, the Rules provide that this failure alone shall be grounds for discipline." The return receipt attached to Carlson's file copy indicated that this letter was received on May 1, 1986, by "R. Johnson," respondent's secretary.

By certified letter dated June 11, 1986, Larson informed respondent that as of June 11 the office of the Counsel for Discipline had not received his response to the Nuttelman complaint and that she intended to file charges against him immediately if a response was not received forthwith. The return receipt for this letter indicated it was received on June 12 by "R. Johnson."

At the June 28, 1988, hearing before the referee, Larson testified that the Committee chose to file charges related to respondent's failure to respond to the Nuttelman complaint,

but that there was discussion before the Committee about the substance of the complaint. Larson further testified that she did not receive a timely response to the Nuttelman complaint.

As to count II, the record shows that on February 20, 1986, the NSBA office of the Counsel for Discipline received a written complaint from JaVee Suhr of Thibault, Suhr & Thibault, Inc., court reporters. This complaint solicited "help and/or advice" in collecting several accounts receivable.

Larson forwarded this complaint to respondent by first-class mail on February 21, 1986. Her letter stated, "In my opinion, [Suhr's] letter does not set forth sufficient facts to file a complaint against you. I would appreciate, however, a written response from you addressing the issues raised."

Larson acknowledged before the referee that her letter of February 21 did not refer to a 15-day response period. She further testified that she elected to proceed under Neb. Ct. R. of Discipline 9(C) (rev. 1986) because under certain circumstances failure to pay a court reporter could constitute fraud or misrepresentation, although "on first blush" she felt there was no basis for a complaint regarding Suhr.

By letters dated April 24 and May 20, 1986, Larson informed respondent that her office had not received his response to the Suhr complaint and requested that he immediately send a written reply to the office of the Counsel for Discipline regarding the Suhr complaint.

Larson's certified letter of June 11, 1986, informed respondent that as of that date her office had not received a response to the Suhr complaint and that if a response were not received immediately, she would "have little choice but to file Charges against you with the District Committee on Inquiry." The return receipt shows that this letter was received by "R. Johnson" on June 12.

Larson testified before the referee that she had a telephone conversation with respondent on June 24, 1986, regarding the Suhr complaint. During that conversation she advised respondent that she had not received a response to the Suhr complaint and was not giving him an extension, but that if he responded she would review his response. Respondent advised Larson that a response would be in shortly, but did not say that

he had already responded. Larson testified that she did not receive a response to either the Nuttelman or Suhr complaint until shortly before the Committee hearing in March 1987, when respondent brought in "what were purported to be or were his responses" to those complaints.

Copies of a June 14, 1986, response to the Suhr complaint and a June 30, 1986, response to the Nuttelman complaint were attached to respondent's answer to the charges before the Committee. The answer was apparently received by the NSBA office of the Counsel for Discipline on November 1, 1986. Whether the respondent's replies to the two complaints were originally attached to his answer is not clear. It is clear, however, that no responses were received by Counsel for Discipline until March 1987.

Respondent was represented by counsel at the June 1988 hearing before the referee. Respondent testified as to his personal problems, overwork, and extensive travel in 1986 and that he was not in his office on a daily basis commencing May or June of that year. He became aware that his secretary, Ricki Johnson, often neglected to do the work he gave her and did not perform her duties while he was out of town, but he did not fire her because he did not want to train another secretary. Respondent also testified that Johnson took some of his files from the office while he was out of town after she had difficulty cashing one of her paychecks.

Respondent testified that after Johnson quit in August 1986, a new secretary discovered a bundle of documents belonging to respondent, including his responses to the Nuttelman and Suhr complaints. These responses were dated June 30, 1986, and June 14, 1986, respectively, but respondent testified the dates on the letters might not reflect either the date the letters were dictated or the day they were mailed. Respondent did recall receiving Larson's June 11, 1986, letter regarding the Nuttelman complaint and Larson's certified letter of June 11, 1986, demanding an immediate response to the Suhr complaint.

At the hearing before the referee, Elizabeth Kountze, an attorney who shared an office with respondent, testified as to Johnson's general incompetence. Kountze stated that she would not allow Johnson to do work for her. She also testified that

after the new secretary was hired, they discovered old mail and notes which had been placed between two books on a table. Kountze did not read the mail, but noted that many of the items belonged to respondent.

As to counts I and II, the referee found that Counsel for Discipline did not receive responses to the Nuttelman and Suhr complaints, that respondent violated DR 1-102 in failing to respond to Counsel for Discipline, and that respondent violated DR 1-102(A)(6) in that he failed to provide management, supervision, and control of his office staff and procedures, which adversely reflected on his fitness to practice law.

Respondent first objects to the referee's finding that he violated DR 1-102(A)(6) by failing to provide management, supervision, and control of his office staff and procedures, contending that DR 1-102(A)(6) is unconstitutionally vague in failing to specify conduct or the nature of specific action which will result in sanctions. Respondent also claims that various procedural and substantive due process violations occurred at virtually every stage of these proceedings.

A lawyer is entitled to due process of law in a disciplinary proceeding.

> Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer. . . . He is accordingly entitled to procedural due process, which includes fair notice of the charge. . . . [O]ne of the conditions this Court considers in determining whether disbarment by a State should be followed by disbarment [in federal court] is whether "the state procedure from want of notice or opportunity to be heard was wanting in due process."

*In re Ruffalo*, 390 U.S. 544, 550, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968).

> "The term 'due process of law' has been often defined as such an exertion of the powers of government as are sanctioned by the settled maxims of the law and under such safeguards for the protection of individual rights as those safeguards prescribed for the class of cases to which the one in question belongs . . . but is satisfied by a proceeding applicable to the subject-matter and

conformable to such general rules as affect all persons alike."

. . . "Due process of law may be said to be satisfied whenever an opportunity is offered to invoke the equal protection of the law by judicial proceedings appropriate for the purpose and adequate to secure the end and object sought to be attained."

*State ex rel. Nebraska State Bar Assn. v. Jensen*, 171 Neb. 1, 28-29, 105 N.W.2d 459, 476 (1960). This court has held: "Due process requires that adjudication be preceded by notice and an opportunity to be heard which is fair in view of the circumstances and conditions existent at the time." (Syllabus of the court.) *Kirshen v. Kirshen*, 227 Neb. 479, 418 N.W.2d 558 (1988).

We also have held that "[t]he established test for vagueness in a statute is whether it either forbids or requires the doing of an act in terms so vague that people of common intelligence must necessarily guess at its meaning and differ as to its application." *Cunningham v. Lutjeharms*, 231 Neb. 756, 763, 437 N.W.2d 806, 812 (1989). See, also, *Weiner v. State ex rel. Real Estate Comm.*, 217 Neb. 372, 348 N.W.2d 879 (1984). However,

[s]ince a disciplinary rule is promulgated for the purpose of guiding lawyers in their professional conduct, and is not directed to the public at large, the central consideration in resolving a vagueness challenge should be whether the nature of the proscribed conduct encompassed by the rule is readily understandable to a licensed lawyer.

*People v. Morley*, 725 P.2d 510, 516 (Colo. 1986). Similarly, the Iowa Supreme Court held that the standard for determining whether a provision of the Code of Professional Responsibility was unconstitutionally vague was "whether a 'reasonable attorney' would understand certain conduct to be prohibited . . . ." *Committee on Professional Ethics v. Durham*, 279 N.W.2d 280, 284 (Iowa 1979). See, also, *Matter of Sekerez*, 458 N.E.2d 229 (Ind. 1984).

DR 1-102(A)(6), when assessed in light of other terms of the Code of Professional Responsibility, has been determined not to be vague. See, e.g., *Committee on Professional Ethics v. Durham, supra.* In counts I and II, respondent was formally

charged with violating a disciplinary rule by failing to respond to letters of complaint. Respondent was required to respond pursuant to Neb. Ct. R. of Discipline 9(E) (rev. 1986). A reasonable attorney would understand that this type of conduct is prohibited and adversely reflects on his fitness to practice law. The record supports a finding that respondent violated DR 1-102(A)(6) in this respect.

We note that respondent was not charged with failure to provide management, supervision, and control of his office staff and procedures. Respondent's own testimony suggested, however, that his failure to respond to the Nuttelman and Suhr complaints is the fault of his secretary, whom he knew to be incompetent.

In *In re Ruffalo, supra*, the petitioner, an Ohio attorney, was charged in disciplinary proceedings with 12 counts of misconduct. During the hearing, a 13th count was added, based on testimony adduced at the hearing. The attorney was disbarred based, in part, on the misconduct charged in count 13. The Court determined that the attorney had not received fair notice as to the reach of the grievance procedure and the precise nature of the charges, depriving the attorney of procedural due process.

> In the present case petitioner had no notice that his employment of Orlando would be considered a disbarment offense until *after* both he and Orlando had testified at length on all the material facts pertaining to this phase of the case. . . .
>
> These are adversary proceedings of a quasi-criminal nature. . . . The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh.
>
> How the charge would have been met had it been originally included in those leveled against petitioner by the Ohio Board of Commissioners on Grievances and Discipline no one knows.

390 U.S. at 550-51.

Even though we conclude that the referee's finding that respondent violated DR 1-102(A)(6) by failing to provide management, supervision, and control of his office staff and procedures was in error, respondent's reliance on his secretary's alleged incompetence as a defense is entirely misplaced. While respondent's failure to properly supervise his employee was not charged against the respondent, such conduct does not constitute a defense to the misconduct charged. A lawyer may not avoid responsibility for misconduct by hiding behind an employee's behavior and may not avoid a charge of unprofessional conduct by contending his employees are incompetent.

The preliminary statement to the Code of Professional Responsibility as adopted by this court states, "A lawyer should ultimately be responsible for the conduct of his employees and associates in the course of the professional representation of the client." "A lawyer also has responsibility to be aware at least of the major areas of responsibility and the actual work habits of employees and to exercise effective supervision." C. Wolfram, Modern Legal Ethics § 16.3.1 at 893 (West 1986).

In *State ex rel. NSBA v. Statmore*, 218 Neb. 138, 142-43, 352 N.W.2d 875, 878 (1984), we said: "A lawyer's poor accounting procedures and sloppy office management are not excuses or mitigating circumstances in reference to commingled funds." (Citations omitted.) Similarly, "[a]n attorney may not escape responsibility to his clients by blithely saying that any shortcomings are solely the fault of his employee. He has a duty to supervise the conduct of his office." *Attorney Griev. Comm'n v. Goldberg*, 292 Md. 650, 655-56, 441 A.2d 338, 341 (1982). We hold that a lawyer is ultimately responsible for the conduct of his employees and associates in the course of the professional representation of the client.

Respondent's testimony shows only that his failure to supervise his employee directly contributed to his failure to timely respond to the Nuttelman and Suhr complaints. He may not use his secretary's alleged incompetence to shield him from the consequences of his unprofessional conduct.

Respondent also contends that Larson's conduct in her allegedly "unauthorized" administrative interpretation of Neb.

Ct. R. of Discipline 9(C), (D), and (E) (rev. 1986) deprived him of due process of law. That rule provides:

> (C) When it appears to the Counsel for Discipline that allegations of misconduct fail to describe conduct which, if true, would constitute grounds for discipline, he may decline to further investigate and he shall so advise the Complainant in writing with a proper explanation within fifteen days of its receipt. All doubts shall be resolved in favor of an investigation.

> (D) If it appears to the Counsel for Discipline that allegations of misconduct do describe conduct which, if true, would constitute grounds for discipline, he shall notify the member against whom the allegations are directed that he is the subject of a complaint, and within fifteen days of its receipt furnish him a copy thereof by certified mail, return receipt requested.

> (E) Upon receipt of notice of a complaint from the Counsel for Discipline, the member against whom the complaint is directed shall prepare and submit to the Counsel for Discipline, in writing, within fifteen working days of receipt of such notice, an appropriate response to the complaint, or a response stating that he refuses to answer substantively and explicitly asserting constitutional or other grounds therefor. For good cause, the Counsel for Discipline may grant additional time for the filing of a response.

Respondent appears to argue that he had no duty to respond to Larson's February 21, 1986, letter forwarding the Suhr complaint because Larson's letter expressed doubt as to whether the Suhr complaint set forth sufficient facts to substantiate a complaint against respondent. Such an argument ignores the plain language of rule 9(C) that "[a]ll doubts shall be resolved in favor of an investigation." Larson chose to forward the complaint to respondent pursuant to rule 9(C) because under certain circumstances failure to pay a court reporter could constitute fraud or misrepresentation. If anything, respondent has been treated too leniently by those he had arrogantly chosen to ignore. In any event, the fourth letter on the Suhr matter was sent by certified mail, and that request also

was ignored by respondent.

We determine that Larson acted properly in demanding a response to the Suhr complaint. As such, rule 9(E) clearly required a response to the complaint within 15 working days of its receipt, or a response stating that respondent refused "to answer substantively and explicitly asserting constitutional or other grounds therefor." In a telephone conversation on June 24, 1986, respondent told Larson that a response would be in shortly, but did not advise her that he had written the June 14, 1986, letter to Carlson responding to the Suhr complaint. The referee concluded that even assuming respondent's June 14, 1986, letter was a part of the bundle of old correspondence discovered in August 1986, "it is incredible that the Respondent chose not to communicate this information to the Counsel for Discipline immediately upon discovery."

The record establishes by clear and convincing evidence that Larson's office did not receive a timely response to the Suhr and Nuttelman complaints, that Larson did not receive any response until just before the Committee hearing on March 18, 1987, and that respondent violated DR 1-102(A)(1) and (6) as alleged in counts I and II.

Respondent further complains he was deprived of due process of law with respect to counts I and II because (1) irrelevant evidence was admitted during the Committee hearing and before the referee, (2) respondent was examined before the Committee in a manner violative of Neb. Ct. Rules of Discipline 7(E)(5) and 9(H)(3)(b) (rev. 1986), (3) a Committee member acted as a witness by making comments during the Committee hearing, and (4) Larson testified, but failed to withdraw as prosecutor, at the Committee hearing.

Disciplinary proceedings are tried in the Supreme Court de novo on the record, and this court will not consider irrelevant evidence or evidence which was erroneously admitted. Cf., *In re Interest of D.L.S.*, 230 Neb. 435, 432 N.W.2d 31 (1988); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). There was no prejudice to respondent in this respect.

We further understand respondent to argue that but for alleged technical improprieties at the Committee level, he would not have been formally charged with misconduct. The

argument is similar to that of a criminal defendant complaining of a court's failure to grant a plea in abatement.

It is the rule in this state that any error in the ruling on a plea in abatement challenging the sufficiency of the evidence at the preliminary hearing is cured by a verdict of guilty if the evidence at trial is sufficient to sustain a finding of guilt beyond a reasonable doubt.

*State v. Navarrete*, 221 Neb. 171, 172, 376 N.W.2d 8, 9 (1985); *State v. Franklin*, 194 Neb. 630, 234 N.W.2d 610 (1975).

Although only those matters which are specifically charged in the complaint in a disbarment proceeding can be considered, a disciplinary proceeding is not a lawsuit with formalities of pleading, nor can technicalities be invoked to defeat the charges where undisputed facts show conduct which is ethically wrong.

*State ex rel. Nebraska State Bar Assn. v. Leonard*, 212 Neb. 379, 383-84, 322 N.W.2d 794, 796 (1982).

This matter advanced from the equivalent of a probable cause hearing before the Committee to a formal due process hearing before the referee and finally to a trial de novo on the record in this court. We have determined that the relevant evidence establishes the misconduct charged in counts I and II by clear and convincing evidence. Under these circumstances, any alleged errors at the Committee level are deemed cured. We determine that respondent was not deprived of due process of law during the Committee hearing and that the foregoing exceptions are without merit.

### COUNT III

Count III of the formal charges alleges:

2. That on or about the 9th day of April, 1980, the Respondent entered his appearance in the Matter of the Estate of Medalo Tapia, Deceased, No. 35395, in the County Court of Lancaster County, Nebraska, by filing an Application for Informal Appointment of Personal Representative in Intestacy.

4 [sic]. That on or about November 13, 1984, Lancaster County Judge James Foster entered an Order to Show Cause to the Personal Representative of the Estate and on

December 3, 1984, a hearing was held on the order to Show Cause at which time the Respondent appeared and indicated that the Estate would be closed forthwith.

5. That on or about January 2, 1985, the Respondent filed a Final Accounting in the above-captioned matter which stated that attorney's fees had been paid in the amount of $25,557.00 to the Respondent and that $12,672.25 of this sum was "attributable to the Estate of William G. Tapia".

6. That as of the undersigned date [April 15, 1987], the Respondent has failed to obtain a County Inheritance Tax Determination in the above-captioned case.

7. That as of [April 15, 1987], the Respondent has failed to file the necessary documents to close the Estate.

That the actions of the Respondent, as set forth above, constitute a violation of his Oath of Office, as an attorney licensed to practice law in the State of Nebraska, as provided by Section 7-104 R.R.S. 1977, and are in violation of the following provisions of the Code of Professional Responsibility, to-wit:

DR 1-102 Misconduct.

(A) A lawyer shall not:

1. Violate a Disciplinary Rule.

5. Engage in conduct that is prejudicial to the administration of justice.

6. Engage in any other conduct that adversely reflects on his fitness to practice law.

DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

3. Neglect a legal matter entrusted to him.

DR 7-101 Representing a Client Zealously.

(A) A lawyer shall not intentionally:

2. Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105.

DR 2-106 Fees for Legal Services.

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

2. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

3. The fee customarily charged in the locality for similar legal services.

4. The amount involved and the results obtained.

5. The time limitations imposed by the client or by the circumstances.

6. The nature and length of the professional relationship with the client.

7. The experience, reputation, and ability of the lawyer or lawyers performing the services.

8. Whether the fee is fixed or contingent.

With respect to count III, the record shows that respondent was retained in December 1979 by Wesley A. Evans, who was later appointed personal representative of the Medalo Frances Tapia and William George Tapia estates. The estates were opened on or about May 16, 1980.

Evans informed respondent that his sister, Medalo Tapia, died on December 7, 1979, in an automobile accident in Waco, Texas, and that her husband, William, died at the couple's residence in Lincoln. William's death remained undiscovered for several days. It was eventually determined, however, that William predeceased Medalo by more than 120 hours. Respondent testified that Evans, who had a sixth grade education, wanted respondent to take care of everything.

Medalo Tapia died intestate. Her estate received approximately $60,000 of William's life insurance proceeds. The Medalo Tapia estate also received all of William's property pursuant to the terms of William's last will and testament. We

note that the first filing in the William Tapia estate was a "Demand for Notice" filed on February 26, 1980, by Valerie Norton. On July 15, 1980, Norton filed a $46,324.22 claim for delinquent child support against the William Tapia estate. Norton was informed by a notice filed December 17, 1984, that Evans, as personal representative of the William Tapia estate, would be unable to pay this claim "for [the] reason that there were insufficient funds available in the Estate to pay expenses of administration, and none available to pay claims."

The estates were initially complicated by the proximity of the deaths and thereafter by the difficulty of tracing estate property. When he began his investigation in December 1979, respondent discovered that the Tapia residence was strewn with a large number of personal papers, personal property (including objects of art consigned to Medalo), and classified Air Force documents. Respondent testified that Medalo had entered into bigamous marriages and used approximately 60 aliases and business names and that William had used 40 aliases. He further testified that he discovered approximately 22 possible insurance policies and had to investigate 41 banks to determine if accounts existed. Respondent stated that he spent considerable time tracing and returning consigned property, returning the classified documents to the FBI, returning government charge cards to the agency of issue, and disposing of charge cards issued to alias names.

Approximately 50 claims were filed, many of which were filed in both estates. Respondent testified that he performed an investigation of an Illinois bankruptcy, which permitted him to deny claims that had been discharged in bankruptcy. He also testified that neither William nor Medalo filed federal income tax returns in 1978, and possibly in previous years, and that he was therefore required to contact IRS service centers in Illinois, Iowa, and Nebraska. Respondent, however, was unable to obtain a "firm written understanding" from the IRS regarding the Tapias' income tax obligations.

Respondent also testified that he discovered evidence of an expensive diamond ring and several motor vehicles. These assets were investigated but never realized for the Medalo Tapia estate. Respondent traveled to Texas in February 1980 to

retrieve property from Medalo's automobile and to investigate a potential wrongful death claim. Respondent determined that a wrongful death claim would not significantly benefit the estate.

Respondent testified that he was still investigating these preliminary matters in 1982.

The Lancaster County Court probate file contains correspondence from Judge Gale Pokorny, dated November 2, 1983, stating that the court expected the Medalo Tapia estate to be closed in 30 days, and December 13, 1983, stating that the court expected the estate to be closed in 45 days or the respondent should schedule a date to personally appear before the court to show why the estate should remain open. Respondent wrote to Judge Pokorny on January 5, 1984, stating that the court's letters had only been recently forwarded to his new business address in Omaha. In this letter, respondent informed the county court (apparently for the first time) of the multitude of documents at the Lincoln residence, the several small business enterprises, Medalo's fraudulent marriages, and the difficulty with the IRS over the decedents' tax returns. Respondent stated that he had unsuccessfully attempted to seek advice from more experienced lawyers and welcomed the court's "direction to personally appear before the court in the immeidate [sic] future" to determine how to proceed.

On February 2 and 22, 1984, the county court again requested respondent to establish a timetable for closing the estates. On April 13, 1984, respondent replied, stating that "[u]pon receipt of your letters," respondent had unsuccessfully contacted the IRS. Respondent stated that he would go ahead and close the estates and advise the heirs to maintain a reserve for possible future tax liability.

Judge Pokorny wrote to respondent on June 18 and July 12, 1984, asking for an explanation as to why the Tapia estates were not closed and stating that if the estates were not closed within 30 days, the matters would be turned over to Dennis Carlson of the NSBA.

On August 8, 1984, Marguerite Evans, the 79-year-old mother and sole heir of Medalo Tapia, wrote to the court concerning the unreasonable delay in the processing of the

estate. On September 14, 1984, Judge Pokorny wrote to Evans and suggested that she contact the NSBA and pursue a complaint.

On October 1, 1984, County Judge James L. Foster wrote to respondent, stating that the estate "will be closed by November 1, 1984 or I will find someone who will see to it that it is closed." On November 13, 1984, Judge Pokorny entered orders to show cause why Wesley Evans should not be removed as personal representative of the Medalo Tapia and William Tapia estates for failure to distribute the property and settle the affairs of the decedents in a reasonable and timely manner. Notes by the county judge regarding a hearing on December 3, 1984, indicated that respondent appeared with the personal representative, that the estate will be closed with $4,343 retained in escrow for exposure on claims, and that a hearing on closing would be set for February 26, 1985.

An inventory was filed on December 11, 1984, showing the net value of approximately $60,000 representing insurance payable to the Medalo Tapia estate. Although the last claims date for both estates was published as August 24, 1980, no notices of disallowance of claim were filed until December 17, 1984.

On January 2, 1985, respondent filed in the Medalo Tapia estate a supplemental inventory, attorney and personal representative fee statements, a final accounting, and a formal petition for complete settlement after informal intestate proceeding. On January 28 respondent filed a petition for determination of inheritance tax and an inheritance tax worksheet, and, on February 1, filed proof of publication for the hearing on final settlement.

At a hearing before Judge Foster on February 25, 1985, the will of William Tapia was formally admitted to probate, and the heirs were determined. We note, in passing, that at this time William Tapia had been dead for approximately 5 years 3 months, and his estate had been pending for at least 4 years 9 months.

With respect to the Medalo Tapia estate, the court found that Medalo died intestate and that her sole heir was her mother, Marguerite F. Evans.

At the February 25 hearing, respondent acknowledged that Deputy Lancaster County Attorney Michael Thew had requested information and documentation "a few weeks back" regarding the inheritance tax worksheet. Thew wanted documentation on $37,000 to $38,000 worth of deductions. Respondent testified that he tried to set up a meeting with Thew right after the hearing, but Thew was not available. Respondent agreed to make an appointment with Thew to resolve inheritance tax deduction matters and resolve any questions or reservations concerning administrative expenses, which represented almost half of the entire estate.

From November 2, 1983, to February 25, 1985, the county court wrote to respondent 9 times, generally requesting that the estates be closed.

On September 22, 1984, Marguerite Evans filed a written complaint with the NSBA. This complaint was dismissed by Counsel for Discipline on October 8, 1984, pursuant to Neb. Ct. R. of Discipline 9(C) (rev. 1986). Rule 9(C), discussed above in connection with the Suhr complaint, allows Counsel for Discipline to dismiss a complaint if it appears that the allegations of misconduct fail to describe conduct which, if true, would constitute grounds for discipline. Carlson's letter of October 8 states that respondent had "related many of the facts which have caused delays in the Estate of Medalo Tapia" and that "[t]hese delays do not appear to be caused by a lack of diligence on the part of Mr. Kirshen." Marguerite Evans appealed this decision to the Committee, which affirmed the decision of Counsel for Discipline to dismiss the complaint, based in part on the extraordinary circumstances presented in the two estates. Correspondence among Committee members shows, however, that respondent said he intended to close the estate informally "and would have filed the appropriate papers . . . except for the illness of his Secretary." Respondent apparently represented to the Committee in 1984 that the IRS matter had been completed and that he would close the estate no later than December 31, 1984. It was the "unanimous view" of the Committee as of December 17, 1984, that there had been no violation of the Code of Professional Responsibility by respondent.

The referee concluded that after February 25, 1985, respondent "was not closing the estate over expenses which, if denied or not allowed, could only increase the inheritance tax by a maximum of $370 to $380." No order was entered on the inheritance tax determination until June 21, 1988, approximately 40 months after the February 1985 hearing.

On August 29, 1985, Marguerite Evans filed another complaint with Counsel for Discipline regarding respondent's failure to contact her or close the Medalo Tapia estate. The correspondence attached to the complaint indicates that respondent gave Marguerite Evans a distribution of $6,440.04 after Larson spoke to him on June 5, 1985, and that respondent told Marguerite Evans she would receive a final distribution of $4,343.23 after the February 1985 hearing. Respondent filed an admittedly "tardy" response to this complaint on November 7, 1985.

The response stated that respondent was still seeking "written clearance of tax liability" from the IRS, although "after consulting with the County Judge I determined to press ahead to close the Estate without a written confirmation." In his November 7 letter, respondent stated that "Mrs. Evans' needs are modest" and that she apparently had "dissipated" the $6,500 previously remitted to her. The letter further states that "[h]ad Mrs. Evans attended the [February 25, 1985,] hearing, of which she was given notice, she would have learned that additional documentation was required before the inheritance tax matter could be resolved." At this time, Marguerite Evans was approximately 80 years old and in poor health.

Larson received correspondence from Marguerite Evans dated October 10, November 7, and November 16, 1985; January 2, March 29, and May 31, 1986; and February 17, 1987, concerning respondent's failure to close the estate.

The record shows that Larson contacted respondent approximately 13 times between August 1985 and June 1986. Larson contacted respondent by letters dated September 3, October 16, November 8, and December 24, 1985, and January 3, January 14, and June 2, 1986, generally requesting status reports, the inheritance tax be resolved, and the estate closed. The record also shows that Larson contacted respondent by

telephone on September 18, October 24, and November 19, 1985, and on January 24 and April 3, 1986.

Respondent apparently ignored Larson's requests for a status report, and on June 11, 1986, Larson informed respondent that "[i]f a response is not received from you immediately, I will have little choice but to reopen this office's investigation regarding the complaint . . . ."

Wesley Evans, the personal representative of both estates, died on December 24, 1985. Marguerite Evans notified Larson of Evans' death by letter dated January 2, 1986. It is indicative of the attention that respondent was giving the estate matters that he first learned of Evans' death on April 3, 1986, during a telephone conversation with Larson. He was "surprised." Respondent did not inform the court of Evans' death until December 30, 1987, over 20 months after he learned of that fact. He now attempts to use Wesley Evans' death as an excuse for his nonperformance as a lawyer. The least he could have done was to inform the court of Evans' death.

The Medalo Tapia estate file contains correspondence from the county court dated January 16, February 27, April 30, October 2, and December 3, 1986, requesting that respondent close the Tapia estates. The record shows no reply to these letters. Nothing transpired in the Lancaster County Court estate file from February 25, 1985, until November 30, 1987, when James L. Rold, attorney for respondent, ordered a transcript of the February 25, 1985, hearing.

On December 30, 1987, respondent petitioned as an interested party for appointment of Steven M. Heinz as successor personal representative of the Medalo Tapia estate. This petition was based on the fact of the death of the personal representative and was prepared for respondent by his attorney, Rold. Heinz was so appointed on January 26, 1988. On June 7, 1988, Rold, as attorney for the successor personal representative, filed a supplemental inventory, a petition for determination of inheritance tax, a formal petition for complete settlement, and a schedule of distribution.

A hearing was held on June 21, 1988. That day, Judge Foster entered the following orders: (1) an order finding that $17,732.09 was a proper and necessary attorney fee to

respondent to close the estate of Medalo Tapia (this amount was exactly that set out in respondent's affidavit seeking fees and the inheritance tax worksheet filed June 20, 1988; it apparently was not questioned by the county court), (2) an order finding that $1,000 was a proper fee for the successor personal representative, (3) an order determining the inheritance tax in the amount of $149.62 assessed against the share of Marguerite Evans, plus interest in the amount of $157.91, and (4) a formal order for complete settlement subject to the verified cashing of the distribution check and payment of court costs and inheritance tax.

As of April 6, 1988, neither estate had been closed. The June 21, 1988, county court hearing concerned only the Medalo Tapia estate. Respondent testified that there was only one estate bank account. Respondent testified he was a signer on the account at the request of Wesley Evans. Respondent prepared and paid his statement of February 25, 1985, in the amount of $2,480.60. This statement was marked "Final," with many references in the statement itself to "closing" the estate. The record shows that respondent had paid himself over $27,000 in fees, with approximately $17,000 allocated to the Medalo Tapia estate.

The referee assumed that as of June 29, 1988, the William Tapia estate had not been closed, noting that there was no evidence on the disposition of that estate. The referee's report concluded:

> The Final Resolution of the William Tapia Estate should result in a payment of up to approximately $10,000 from the Respondent to the William Tapia Estate as a refund of excessive attorney fees. The William Tapia Estate simply pours over to the Medalo Tapia Estate and therefore the Medalo Tapia Estate cannot be resolved and closed until the William Tapia Estate is finally resolved and closed.

> It is the opinion of the Referee, that the Respondent should not seek nor receive any fee in the William Tapia Estate since the fee approved by the Court on June 21, 1988 in the Medalo Tapia Estate is more than generous for the reasonable amount of work and effort that should

have been sufficient to resolve both estate proceedings shortly after the February 25, 1985 hearing on closing both estates.

Respondent offered into evidence a release executed by Marguerite Evans dated June 25, 1988, which states that she releases respondent from any liability for his performance in the representation of the estate of Medalo Tapia and withdraws her complaint filed with the NSBA concerning respondent's conduct. On the bottom of the release, however, appears a statement that Evans "retains her rights and this release shall not apply to the misallocation of the two said checks, namely one to Evans Construction Co. for $2,069.25 and one to M.U.D. for $281.03." This statement refers to the schedule of distribution which shows estate funds paid to Evans Construction Company and to M.U.D. as being distributions to Marguerite Evans. The record contains neither a formal closing receipt executed by Marguerite Evans nor a discharge of the personal representative by the court. The release executed by Evans continues to clearly state her continuing dissatisfaction with respondent's conduct.

The Committee is empowered by Neb. Ct. R. of Discipline 7(E)(6) and (7) (rev. 1986) to conduct investigations of a complaint independent of the Counsel for Discipline and to investigate, on its own motion, any act of unprofessional conduct of a member. No formal charges are considered by this court until they have been considered by a Committee on Inquiry and the Board. Neb. Ct. R. of Discipline 9(M) (rev. 1986). Under our rules of discipline, Marguerite Evans had no standing to maintain a disciplinary action against respondent or any authority to effectively discharge a complaint. Cf. *Mattice v. Meyer*, 353 F.2d 316 (8th Cir. 1965). Consequently, the existence of a release is not determinative.

Respondent attributed his failure to close the Tapia estates to the complexity of the estates, the death of the personal representative, and personal problems and overwork in 1986. Respondent also testified that he was unable to resolve the inheritance tax issues in 1985 because Wesley Evans' ex-wife, who had been doing bookkeeping for the estate, absconded with the backup documentation and also because Thew had

been unavailable both times respondent contacted him after the February 25, 1985, hearing.

As to count III, the referee found that respondent violated DR 1-102(A)(6) and DR 6-101(A)(3) by:

1. Neglecting for a period of eleven months, from 1-5-84 to 12-3-84, to appear before the Lancaster County Court, an opportunity that Respondent "welcomed", but neglected until responding to an Order to Show Cause;

2. Neglecting to resolve an Inheritance Tax deduction item of nominal value to the ultimate beneficiary for a period of at least ten months from 2-25-85 to 12-24-85, the date of death of the Personal Representative; or for the actual period of forty months from 2-25-85 to 6-21-88;

3. Neglecting to contact the Lancaster County Court and communicate the fact of the death of the Personal Representative after Respondent first learned of that fact on 4-3-86;

4. Neglecting to take any responsibility for the estate for a period of twenty months from 4-3-86 until 12-30-87 when Respondent, as an interested party, signed a Petition for the appointment of a Successor Personal Representative.

5. Neglecting the recommendation of the Referee in October 1987 and the continuance of these proceedings in February 1988 to close both [the Medalo Tapia and William Tapia] estate administration proceedings in Lancaster County Court.

The referee also found there was no valid basis for the neglect in failing to close both the Medalo Tapia and William Tapia estates shortly after February 25, 1985.

Respondent first contends that evidence of Marguerite Evans' 1984 complaint was improperly admitted and that his actions prior to December 17, 1984, in the Tapia matter are res judicata. This contention is based on the fact that the Committee determined in 1984 that respondent was not in violation of the Code of Professional Responsibility. We find no merit in this contention.

The doctrine of res judicata applies when the same cause of action is sought to be litigated a second time. . . .

The doctrine rests upon the principle that a final judgment on the merits by a court of competent jurisdiction is conclusive upon the parties in any later litigation involving the same cause of action.

*Graham v. Waggener*, 219 Neb. 907, 909-10, 367 N.W.2d 707, 709 (1985). See, also, *Mississippi State Bar v. Young*, 509 So. 2d 210 (Miss. 1987). The dismissal of Marguerite Evans' first complaint occurred at a preliminary inquiry stage, after respondent promised to the Committee that he would close the estate no later than December 31, 1984. The matter was never formally adjudicated; therefore, the doctrine of res judicata does not apply.

Respondent next argues that since his actual client was the personal representative, Wesley Evans, he had no duty to the estate after December 24, 1985, the date of Evans' death. We first note that respondent learned of Evans' death on April 3, 1986, but failed to notify the county court that his client had died even after receiving correspondence from the court dated April 30, October 2, and December 3, 1986, demanding that the Tapia estates be closed. Neb. Ct. R. of Cty. Ct. 5 (rev. 1989) allows an attorney of record to withdraw for good cause shown, but only after the court enters an order authorizing the withdrawal. Similarly, Neb. Ct. R. of Cty. Ct. 6 (rev. 1989) provides that when counsel's employment has been terminated, "counsel shall immediately file notice of it, and serve a copy upon all other parties to the suit." Rule 6 at 13.2.

The fact that these estates were still open in 1988 is a direct consequence of respondent's unprofessional conduct in failing to notify the court of Evans' death. His assertions to the contrary are without merit.

The evidence is clear and convincing that respondent violated DR 6-101(A)(3) and DR 1-102(A)(6) by his egregious neglect of the Medalo Tapia estate.

## DISCIPLINE TO BE IMPOSED

Respondent finally contends that the referee's recommendation of 1 year's suspension is too harsh. Not only do we determine that the referee's suggested sanction on respondent is not too harsh, we determine that the suggested

sanction is too lenient.

In *State ex rel. NSBA v. Rasmussen, ante* p. 53, 55, 439 N.W.2d 481, 483 (1989), we said:

> The nature and extent of discipline to be imposed is determined by a consideration of the nature of the offense, the need for deterring others, the maintenance of the reputation of the bar as a whole, the protection of the public, the attitude of the offender generally, and his or her present or future fitness to continue in the practice of law.

See, also, *State ex rel. NSBA v. Cohen*, 231 Neb. 405, 436 N.W.2d 202 (1989). Cumulative acts of misconduct are distinguishable from isolated incidents of neglect and therefore justify more serious sanctions. *State ex rel. NSBA v. Rasmussen, supra*; *State ex rel. NSBA v. Frank*, 214 Neb. 825, 336 N.W.2d 557 (1983). Violation of any of the ethical standards relating to the practice of law or any conduct of an attorney which tends to bring reproach on the courts or the legal profession constitutes grounds for suspension or disbarment. *State ex rel. NSBA v. Rasmussen, supra.*

The record shows that respondent received a private reprimand on October 25, 1985, for failing to respond to a client's complaint, in violation of DR 1-102(A)(1), (5), and (6). Since that time, respondent has substantially ignored and neglected numerous contacts by the county court and by Counsel for Discipline.

As an attorney licensed to practice law in the State of Nebraska, respondent submitted to the exclusive disciplinary jurisdiction of this court. His failure to respond to the Nuttelman and Suhr complaints and his grudging cooperation in the investigation and attempted resolution of the Tapia estates evidence respondent's disrespect for our disciplinary jurisdiction and his lack of concern for the protection of the public, the profession, and the administration of justice.

In submitting a pleading, "Motion For Orders Concerning Case Progression Standards and Attorney Fee," respondent further showed his unfitness to be a practicing lawyer. This pleading was filed in the county court on June 20, 1988. Included in it are respondent's assertions that part of the

problems for his long delay in acting was "j. An alcoholic personal representative who eventually committed suicide."

As a further excuse, respondent also asserted "k. That counsel's efforts in this matter were frustrated by his relationship with the eighty plus year old distributee who caused counsel to be investigated twice by the Nebraska Bar Association."

In his November 7, 1985, letter to Larson, respondent states as follows:

Apparently Mrs. Evans is anxious for the remainder of the funds coming to her after inheritance tax has been made and final settlement effected. I do not know what she has done with the $6500 previously remitted to her, but Mrs. Evans' needs are modest and there has been concern about others seeking to get their hands on Mrs. Evans' inheritance, even to the point of family members considering the possibility of a conservatorship. If Mrs. Evans is in due need of the balance due her, apparently the prior remittance is now dissipated.

This further shows respondent's ignorance of his role as lawyer for the personal representative. The money was not respondent's, but was the property of Marguerite Evans to do with as she would.

A lawyer, with the great responsibilities that that position requires, should not disparage his clients or those for whose benefit he is purportedly acting, and hide behind their alleged faults to excuse his own ineptitude. Not only is such an approach unmannerly and unseemly, it is not recognized as a defense to disciplinary matters. If a lawyer accepts a case, that case must be handled professionally. If, due to personal relationship problems, the lawyer cannot handle his responsibility, the lawyer must withdraw and turn the matter over to a lawyer who has the competence and integrity to conclude the legal matter properly.

Respondent has not so conducted himself in this case. As defenses he relies on alleged bad personal circumstances of his client, the personal representative; the age of the distributee; the conduct of the Assistant Counsel for Discipline; the conduct of the Committee; and, indeed, the conduct of all involved with

him. He has never expressed concern for the distributee, who is now approximately 84 years old, although she was a young 75 years old when her daughter died.

Such conduct is not that of a lawyer who holds himself out to represent members of the public.

The record shows that respondent's conduct is not an isolated incident, but a continuing pattern of neglect and contempt for the disciplinary rules adopted by this court. The record clearly demonstrates that respondent has violated his oath of office and the disciplinary rules cited by the referee. We have no confidence that a public reprimand, or even suspension, would serve to modify respondent's attitude or to protect the public. We recognize that disbarment is a harsh penalty. We conclude that in the circumstances of this case, a judgment of disbarment is appropriate.

Finally, we must address a remaining problem. The record before us does not indicate that the Tapia estates are closed even yet. The findings of the referee set out with regard to the interrelation of the William Tapia and Medalo Tapia estates are as follows:

> The Corrected Final Accounting [in the Medalo Tapia estate] filed on June 20, 1988 had a balance of approximately $11,500.00. The Respondent did not offer any evidence as to the amount of the "final distribution check" that Mr. Heinz attempted to deliver to the sole beneficiary, Marguerite Evans.
>
> There was no evidence on the disposition of the William Tapia Estate and therefore, the referee assumes that the William Tapia Estate has still not been closed.
>
> The Final Resolution of the William Tapia Estate should result in a payment of up to approximately $10,000 from the Respondent to the William Tapia Estate as a refund of excessive attorney fees. The William Tapia Estate simply pours over to the Medalo Tapia Estate and therefore the Medalo Tapia Estate cannot be resolved and closed until the William Tapia Estate is finally resolved and closed.
>
> It is the opinion of the Referee, that the Respondent should not seek nor receive any fee in the William Tapia

Estate since the fee approved by the Court on June 21, 1988 in the Medalo Tapia Estate is more than generous for the reasonable amount of work and effort that should have been sufficient to resolve both estate proceedings shortly after the February 25, 1985 hearing on closing both estates.

Our concern is that no court seems to be exercising any control over these two estates. A county court has inherent power to enforce the administration of judicial matters before it.

After the Medalo Tapia estate had been open for more than 8 years at the time of the June 1988 hearing to "close" that estate, some court should exercise its jurisdiction to see that this matter is concluded.

When an estate reaches the state of confusion these estates did, the overall supervisory powers of the county court must be brought into play. Close examination of the convoluted pleadings in the Medalo Tapia estate would show many things that a court should check. Among other things, in his "Affidavit In Support Of Attorney's Fees," respondent states: "9. That Mrs. Tapia had a brother and children from a former marriage that had to be dealt with." Of course, if such a statement were true, as respondent swore in his affidavit, Medalo Tapia's mother would not be the "sole distributee" in Medalo Tapia's estate. See Neb. Rev. Stat. § 30-2303 (Reissue 1985). Whether there are progression standards or not, a court has the obligation to so conduct the legal business before it as to render the services to the public that are the purpose of the court's institution.

In the case before us, we are not concerned with an appeal from any orders of the county court. As far as we know, no such appeals have been taken. We do know, however, that the record before us shows that respondent has received $10,000 or $12,000 from the $2,000 estate of William Tapia. Some court has the duty to straighten that out.

The county court has determined that a requested fee of $17,732.09 in the Medalo Tapia estate is a "proper, necessary attorney fee to close this estate." The court, insofar as the record before us shows, had not made a fee award in the

William Tapia estate. The county court should exert every effort to finally close both estates and to give to Marguerite Evans the justice she has sought since 1984.

JUDGMENT OF DISBARMENT.